Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com
*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STAN KIEFFER, derivatively on behalf of EDISON INTERNATIONAL and SOUTHERN CALIFORNIA EDISON, | Case No.: |
| Plaintiff, | |
| v. | |
| PEDRO J. PIZARRO, MARIA RIGATTI, JAGJEET S. BINDRA, MICHAEL C. CAMUNEZ, VANESSA C.L. CHANG, THEODORE F. CRAVER, JR., LOUIS HERNANDEZ, JR., RON LITZINGER, JAMES T. MORRIS, TIMOTHY O'TOOLE, KEVIN M. PAYNE, WILLIAM M. PETMECKY III, RICHARD T. SCHLOSBERG III, WILLIAM JAMES SCILACCI, LINDA G. STUNTZ, WILLIAM P. SULLIVAN, ELLEN O. TAUSCHER, PETER J. TAYLOR, and BRETT WHITE, | **VERIFIED SHAREHOLDER DERIVATIVE AND DOUBLE DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| EDISON INTERNATIONAL, and SOUTHERN CALIFORNIA EDISON | |
| Nominal Defendants. | |

Verified Shareholder Derivative and Double Derivative Complaint

**INTRODUCTION**

Plaintiff Stan Kieffer ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendants Edison International ("Edison International") and Southern California Edison ("SCE"), Edison International's operating subsidiary (collectively, "Edison" or the "Company") files this Verified Shareholder Derivative and Double Derivative Complaint against Individual Defendants Pedro J. Pizarro, Maria Rigatti, Jagjeet S. Bindra, Michael C. Camunez, Vanessa C.L. Chang, Theodore F. Craver, Jr., Louis Hernandez, Jr., Ron Litzinger, James T. Morris, Timothy O'Toole, Kevin M. Payne, William M. Petmecky III, Richard T. Schlosberg III, William J. Scilacci, Linda G. Stuntz, William P. Sullivan, Ellen O. Tauscher, Peter J. Taylor, and Brett White (collectively, the "Individual Defendants," and together with Edison, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Edison, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Edison, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Edison's directors and officers from at least March 21, 2014 to August 10, 2015 (the "First Relevant Period") and February 23, 2016 through the present (the "Second Relevant Period").

2.      Edison International is an electric utility holding company which generates, distributes, and provides electric power and energy through subsidiaries in California such as SCE. The Company services residential, commercial, industrial, and agricultural customers as well as public authorities through distribution and transmission networks including underground and overhead lines and hundreds of substations across California.

3.      Edison International primarily operates through SCE, one of the largest electric utilities in the United States. SCE is an investor-owned public utility which services about 15 million people across a 50,000 square-mile expanse in Southern California.

4.      Throughout the past several years, Edison has been the subject of multiple investigations involving the California Public Utilities Commission ("CPUC") and other regulatory bodies for faulty equipment, failing to maintain its facilities in compliance with state safety laws, and on occasion, for engaging in *ex parte* communications during a purported settlement agreement relating to the shutdown of a nuclear power plant in San Diego County ("San Onofre").

5.      On March 20, 2014, Edison announced that it was entering settlement negotiations with interested parties involved in the shutdown of San Onofre. After a settlement had purportedly been finalized, ongoing investigations by the California Attorney General's Office and the CPUC uncovered that secret *ex parte* discussions, including several improper communications with the CPUC, had occurred (the "Ex Parte Misconduct"). As details about the *ex parte* discussions came to light, the Company's stock price declined. By August 10, 2015, interested parties to the settlement, namely, customer rate representatives, recanted the settlement terms, leading to a decline in the Company's value.

6.      While the Company attempted to handle the San Onofre dispute over the next few years, its operations on the ground, particularly with its operating subsidiary SCE, became a cause of concern due to CPUC investigations into the Company's facilities following wildfires in 2017 and 2018 (the "Facilities Misconduct").

Verified Shareholder Derivative and Double Derivative Complaint

7.  On December 4, 2017, wildfires ignited across Southern California, beginning one of the largest and detrimental wildfires in California's modern history, the Thomas Fire (the "2017 Fire"). The 2017 Fire, carried by heavy winds, spread over 280,000 acres of land, engulfing thousands of homes and structures as it went, and spreading throughout Ojai, Santa Paula, Fillmore, Ventura, and Santa Barbara counties. The 2017 Fire persisted for over a month, killing at least two people and dislocating hundreds of others. When the fire was finally fully contained in January 2018, devastating mudslides began after rainfall mixed with the eroded earth, further wreaking havoc on the Montecito, California communities (the "Mudslides").

8.  As a result of CPUC investigations into whether the Company was a prudent manager of its facilities, the Company's stock price fell over the course of the 2017 Fire. Prior to the 2017 Fire, the stock price fluctuated around $75 per share. However, on December 5, 2017, the day after the 2017 Fire began, the price per share of the Company's stock closed at $66.68 and has further dropped since.

9.  On November 8, 2018, two new wildfires began in Southern California, the Hill Fire and the Woolsey Fire (the "2018 Fires"). The 2018 Fires destroyed over 98,000 acres of land. CPUC soon after began investigating SCE on November 12, 2018, to assess its compliance with required safety regulations in the fire-impacted areas.

10.  On November 12, 2018, following the CPUC's investigation announcement, the Company's stock price fell more than 12% to close at $53.56 per share. As the 2018 Fires persisted, the Company's stock price continued to drop. By close of business on November 15, 2018, the price per share of the Company's common stock had fallen to $47.19. Collectively, the stock price dropped about 32% following the CPUC investigation announcement.

11.  During the First Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to engage in *ex parte* communications during purported settlement discussions with CPUC officials regarding the San Onofre settlement terms without involving all interested parties.

Verified Shareholder Derivative and Double Derivative Complaint

12.     The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company engaged in and/or allowed the Ex Parte Misconduct; (2) the Company was not abiding by applicable rules with respect to the settlement discussions surrounding the shutdown of San Onofre; (3) the Company was making false representations regarding the resolution of the San Onofre dispute; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

14.     During the Second Relevant Period, the Individual Defendants breached their fiduciary duties by engaging in and/or causing the Company to engage in the Facilities Misconduct, thereby increasing the risk of wildfire occurrence in California by failing to maintain their facilities appropriately and failing to remediate areas that the Individual Defendants were aware had been the subject and focus of numerous investigations in the past.

15.     The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company was operating in violation of state laws and regulations; (2) the Company failed to align its facilities, electricity transmission, and distribution networks with required state laws and safety regulations; (3) Edison's failure to comply with state safety regulations heightened the risks for

Verified Shareholder Derivative and Double Derivative Complaint

wildfires in California; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

17.     During the First Relevant Period and the Second Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

18.     Furthermore, during the First Relevant Period and the Second Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while nine of them engaged in insider sales, netting proceeds of over $79.8 million.

19.     Approximately 4.6 million shares of the Company's common stock were repurchased at inflated prices between September 1, 2014 and May 31, 2015 for over $298.1 million. As the Company's stock was actually only worth $59.00 per share, the price at which it was trading on August 11, 2015, the Company overpaid approximately $26 million in total.

20.     Approximately 11 million shares of the Company's common stock were repurchased at inflated prices between March 1, 2016 and September 30, 2018 for over $811.1 million. As the Company's stock was actually only worth $47.19 per share, the price at which it was trading on November 15, 2018, the Company overpaid approximately $288 million in total.

21.     In light of the Individual Defendants' misconduct, which has subjected Edison, its former President and Chief Executive Officer ("CEO"), and its former Executive Vice President and Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit filed in the United States

Verified Shareholder Derivative and Double Derivative Complaint

District Court for the Southern District of California[1](the "First Class Action"), and the Company, its current CEO, former CEO, current CFO, and former CFO to being named defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Second Class Action," and together with the First Class Action, the "Securities Class Actions"), to numerous lawsuits lodged against the Company resulting from the 2017 Fire and Facilities Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

22.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the current CEO's and CFO's liability in the Second Class Action, the former CEO's and former CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Edison's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

---

[1] Pending in the U.S. Court of Appeals, Ninth Circuit

Verified Shareholder Derivative and Double Derivative Complaint

24.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

25.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

28.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

29.    Venue is proper in this District because Edison and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

30.    Plaintiff is a current shareholder of Edison International common stock. Plaintiff has continuously held Edison International common stock at all relevant times. Plaintiff is a citizen of California.

### Nominal Defendant Edison

31.    Edison International is a California corporation with its principal executive offices at 2244 Walnut Grove Avenue (P.O. Box 976) Rosemead, CA, 91770. Edison International's shares trade on the NYSE under the ticker symbol "EIX."

32.    SCE is a corporation with its principal executive offices at 2244 Walnut Grove Avenue (P.O. Box 800) Rosemead, CA, 91770. SCE is the operating subsidiary of Edison International.

7

**Defendant Pizarro**

33.     Defendant Pedro J. Pizarro ("Pizarro") has served as the Company's President since June 2016 and CEO since October 2016. He has also served as a director of the Company since 2016. Defendant Pizarro has held an array of executive positions at Edison International companies since 1999. According to the Company's Schedule 14A filed with the SEC on March 16, 2018 (the "2018 Proxy Statement"), as of March 1, 2018, Defendant Pizarro beneficially owned 351,504 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Pizarro owned approximately $21.3 million worth of Edison stock.

34.     For the fiscal year ended December 31, 2017, Defendant Pizarro received $9,754,920 in compensation from the Company. This included $1,172,356 in salary, $2,672,004 in stock awards, $2,671,880 in option awards, $1,469,531 in non-equity incentive plan compensation, $1,654,633 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings, and $114,516 in all other compensation.

35.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Pizarro made the following sale of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| December 19, 2014 | 135,750 | $     65.05 | $     8,830,537 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

36.     The Company's 2018 Proxy Statement stated the following about Defendant Pizarro:

Mr. Pizarro has been the President and CEO of EIX since October 2016. Prior to that, he served as President of EIX from June 2016 to September

Verified Shareholder Derivative and Double Derivative Complaint

2016 and President of SCE from October 2014 to May 2016. Mr. Pizarro has held a wide range of executive positions at the EIX companies since joining EIX in 1999. From 2011 through March 2014, he served as President of EME, an indirect subsidiary of EIX that filed for bankruptcy in 2012. Prior to that, Mr. Pizarro served as Executive Vice President of SCE from 2008 to 2010, responsible for SCE's transmission and distribution system, procurement of conventional and renewable power, and gas-fired and hydroelectric power production facilities. He also previously served as Vice President and Senior Vice President of Power Procurement, and Vice President of Strategy and Business Development, among other executive roles. Prior to his work at the EIX companies, Mr. Pizarro was a senior engagement manager with McKinsey & Company, providing management consulting services to energy, technology, engineering services, and banking clients. He is a director of the Edison Electric Institute and the Electric Power Research Institute, and is a member of the Board of Governors of Argonne National Laboratory. Mr. Pizarro is a graduate of Harvard University and earned a Ph.D. in chemistry from the California Institute of Technology, where he serves as a member of the Board of Trustees.

**Specific Qualifications and Experience Relevant to the Company**[2]
Mr. Pizarro brings to the Board in-depth knowledge of the Company's business, experienced leadership, and operations and strategic planning experience and background. His leadership and experience dealing with difficult challenges during the EME bankruptcy adds value to the Board. He also brings experience as a director of various non-profit organizations.

37.     Upon information and belief, Defendant Pizarro is a citizen of the State of California.

**<u>Defendant Rigatti</u>**

38.     Defendant Maria Rigatti ("Rigatti") has served as Edison International's executive Vice President and CFO since October 2016. According to the 2018 Proxy Statement, as of March 1, 2018 Defendant Rigatti beneficially owned 88,194 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Rigatti owned approximately $5.3 million worth of Edison stock.

---

[2] Emphasis in original unless otherwise noted in this Complaint.

9

39.     For the fiscal year ended December 31, 2017, Defendant Rigatti received $2,846,081 in compensation from the Company. This included $591,346 in salary, $643,586 in stock awards, $643,506 in Option Awards, $470,250 in non-equity incentive plan compensation, $454,620 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings, and $42,773 in all other compensation.

40.     The Company's website states the following about Defendant Rigatti:[3]

Maria Rigatti is executive vice president and chief financial officer of Edison International, the parent company of Southern California Edison (SCE), one of the nation's largest electric utilities, and Edison Energy, a portfolio of competitive businesses that provide commercial and industrial customers with energy management and procurement services.

Prior to her current role, Rigatti was senior vice president and chief financial officer at SCE. She was responsible for the utility company's financial management and fiscal integrity, directing both corporate and business unit financial planning and budgeting, treasury, accounting, tax and risk management.

Previously, Rigatti was senior vice president and chief financial officer at Edison Mission Energy (EME), a competitive generation subsidiary of Edison International at the time. She served in a variety of positions at EME during her 15 years with the company, including vice president and treasurer and vice president, project structuring and valuation, and was actively involved in the sale of substantially all of the assets of EME to NRG Energy in 2014.

Before joining EME, Rigatti held positions at PIRA Energy Group, an energy consulting firm, and at Gas Energy Inc., a subsidiary of the former KeySpan Corp., a group of regulated natural gas and electric utilities with unregulated subsidiaries, which is now part of National Grid. She also worked at The Chase Manhattan Bank.

Rigatti serves on the board of Discovery Cube Orange County and was previously on the board of Orange County United Way.

---

[3]     https://www.edison.com/home/about-us/leadership/edison-international-leaders/maria-rigatti.html. Last visited Jan. 21, 2019.

Verified Shareholder Derivative and Double Derivative Complaint

Rigatti graduated with honors from Manhattan College with a bachelor's degree in finance, and she earned an MBA in finance from New York University.

41.    Upon information and belief, Defendant Pizarro is a citizen of the State of California.

**Defendant Bindra**

42.    Defendant Jagjeet S. Bindra ("Bindra") served as a Company director from 2010 until April 27, 2017. He also served as a member of the Audit Committee and Chair of the Finance, Operations, and Safety Oversight Committee ("FOSO"). According to the Company's Schedule 14A filed with the SEC on March 17, 2017 (the "2017 Proxy Statement"), as of March 3, 2017, Defendant Bindra beneficially owned 11,938 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 3, 2017 was $79.49, Bindra owned approximately $948,951 worth of Edison stock.

43.    For the fiscal year ended December 31, 2016, Defendant Bindra received $270,157 in compensation from the Company. This included $125,125 in fees earned or cash paid, $135,032 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Bindra received $78,500 in compensation from the Company. This included $68,500 in fees earned or cash paid and $10,000 in all other compensation.

44.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bindra made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 7, 2016 | 3,995 | $   73.80 | $     294,831 |

Verified Shareholder Derivative and Double Derivative Complaint

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

45.    The Company's Schedule 14A filed with the SEC on March 18, 2016 (the "2016 Proxy Statement") stated the following about Defendant Bindra:

> Mr. Bindra served as president of Chevron Global Manufacturing, responsible for Chevron Corporation's worldwide refining operations, from 2004 until his retirement in 2009. During his 32-year career at Chevron, Mr. Bindra also served as managing director and chief executive officer of Caltex Australia Limited, president of Chevron Pipeline Co., and senior vice president, pipelines, of Chevron Overseas Petroleum, Inc. He is a director of LyondellBasell Industries N.V. and WorleyParsons Ltd., and previously served as a director of Transocean Ltd. Mr. Bindra is a graduate of the Indian Institute of Technology in Kanpur, India, and holds a Master of Science degree in Chemical Engineering from the University of Washington and an MBA degree from Saint Mary's College of California.

> **Specific Qualifications and Experience Relevant to the Company**
> Mr. Bindra brings to the Board global operations experience in a capital intensive industry in the energy sector, which is particularly relevant to the Company's capital and infrastructure investment strategy and operational excellence program. He has expertise in energy value chain and asset management, and in safety and operational risk management, which he brings to Board deliberations. This experience is valuable in Mr. Bindra's role as the Company's FOSO Committee Chair.

46.    Upon information and belief, Defendant Bindra is a citizen of the State of California.

**<u>Defendant Camunez</u>**

47.    Defendant Michael C. Camunez ("Camunez") has served as a Company director since 2017. He also serves as a member of the Audit Committee and Nominating/Corporate Governance Committee. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Camunez beneficially owned 1,265 shares of the Company's common stock. Given that the price per share of the Company's common

Verified Shareholder Derivative and Double Derivative Complaint

stock at the close of trading on March 1, 2018 was $60.78, Camunez owned approximately $76,886 worth of Edison stock.

48. For the fiscal year ended December 31, 2017, Defendant Camunez received $187,077 in compensation from the Company. This included $85,750 in fees earned or cash paid, and $101,327 in stock awards.

49. The Company's 2018 Proxy Statement stated the following about Defendant Camunez:

> Mr. Camuñez has been the president and chief executive officer of Monarch Global Strategies (previously ManattJones Global Strategies), a strategic advisory firm to companies doing business in emerging economies, since 2013. He was also a partner of the law firm Manatt, Phelps & Phillips LLP from 2013 to 2016. From 2010 to 2013, Mr. Camuñez served as assistant secretary of commerce for market access and compliance at the U.S. Department of Commerce, and from 2011 to 2013 also served as a commissioner on the U.S. Commission on Security and Cooperation in Europe. Before his Department of Commerce service, Mr. Camuñez was special counsel to the President in the Office of the White House Counsel and special assistant to the President, where he helped manage senior appointments to the President's cabinet. He previously served as a senior policy advisor in the Clinton administration and a partner of O'Melveny & Myers LLP. Mr. Camuñez is a director of the Association of Mexican Entrepreneurs, the Pacific Council on International Policy, and the Center for Law and Social Policy. He is a graduate of Harvard University and received his law degree from Stanford Law School.

> **Specific Qualifications and Experience Relevant to the Company**
> Mr. Camuñez brings to the Board government, public policy and legal experience relevant to the Company's business and strategy. He also brings knowledge of the diverse perspectives of the community served by SCE as a resident and business owner in Southern California.

50. Upon information and belief, Defendant Camunez is a citizen of the State of California.

### **Defendant Chang**

51. Defendant Vanessa C.L. Chang ("Chang") has served as a Company director since 2007. She also serves as a member of the Compensation Committee and the Audit

Verified Shareholder Derivative and Double Derivative Complaint

Committee. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Chang beneficially owned 11,032 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Defendant Chang owned approximately $670,524 worth of Edison stock.

52.    For the fiscal year ended December 31, 2017, Defendant Chang received $296,688 in compensation from the Company. This included $113,250 in fees earned or cash paid, $135,068 in stock awards, $38,370 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings, and $10,000 in all other compensation.

53.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chang made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 16, 2017 | 2,500 | $    79.03 | $     197,575 |

Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

54.    The Company's 2018 Proxy Statement stated the following about Defendant Chang:

> Ms. Chang has been a director of EL & EL Investments, a private real estate investment business, since 1999. She previously served as chief executive officer and president of ResolveItNow.com, an online dispute resolution service, senior vice president of Secured Capital Corporation, a real estate investment bank, and a partner of the accounting firm KPMG Peat Marwick LLP. Ms. Chang is a director of Sykes Enterprises, Incorporated and Transocean Ltd., and a director or trustee of 17 funds advised by the Capital Group and its subsidiaries, of which seven are members of the American Funds family and ten are members of Capital Group's Private Client Services. She is a graduate of the University of British Columbia and a Certified Public Accountant (inactive).

**Specific Qualifications and Experience Relevant to the Company**

14

Ms. Chang brings to the Board experience in accounting and financial reporting and governance matters. This experience is valuable in her role as a financial expert on the Audit Committee. Ms. Chang spent most of her career in the Southern California area and brings knowledge of the community served by SCE. She also brings experience as a director of public, private, and non-profit organizations, and securities regulation and corporate governance knowledge.

55.    Upon information and belief, Defendant Chang is a citizen of the State of California.

**Defendant Craver**

56.    Defendant Theodore F. Craver, Jr. ("Craver") served as a Company director from 2007 until his retirement in September 2016. He additionally served as the President and CEO of the Company from 2013 until his retirement in 2016. According to the 2017 Proxy Statement, as of March 3, 2017, Defendant Craver beneficially owned 2,735,349 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 3, 2017 was $79.49, Craver owned approximately $217.4 million worth of Edison stock.

57.    For the fiscal year ended December 31, 2016, Defendant Craver received $8,659,905 in compensation from the Company. This included $938,697 in fees earned or cash paid, $2,968,836 in stock awards, $2,968,751 in option awards, $997,366 in Non-equity incentive plan compensation, $371,205 in Change in Pension Value and Non-Qualified Deferred Compensation, and $415,051 in all other compensation.

58.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Craver made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 31, 2014 | 172,644 | $    53.03 | $    9,155,311 |

Verified Shareholder Derivative and Double Derivative Complaint

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

59.     The Company's 2016 Proxy Statement stated the following about Defendant Craver:

> Mr. Craver has been the Chairman of the Board, President, and Chief Executive Officer of EIX since 2008. He served as Chairman of the Board, President and Chief Executive Officer of EME from 2005 to 2008, and, prior to that, Executive Vice President, Chief Financial Officer and Treasurer of EIX. Before joining the Company as Vice President and Treasurer in 1996, Mr. Craver served as executive vice president and corporate treasurer of First Interstate Bancorp and executive vice president and chief financial officer of First Interstate's wholesale banking subsidiary. He is a director of Health Net, Inc. Mr. Craver is a graduate of the University of Southern California, where he also received his MBA degree.
>
> **Specific Qualifications and Experience Relevant to the Company**
> Mr. Craver brings to the Board in-depth knowledge of the Company's business, industry and strategy, experienced leadership and a finance background. He has had experience dealing with difficult challenges faced by the Company, including the California energy crisis. He is a leader in the electric utility industry, and served as chairman of the Edison Electric Institute, an association of U.S. shareholder-owned electric companies, and is serving as a director of the Electric Power Research Institute, which provides independent, public-benefit research and development relating to the generation, delivery and use of electricity.

60.     Upon information and belief, Defendant Craver is a citizen of the State of California.

**Defendant Hernandez**

61.     Defendant Louis Hernandez, Jr. ("Hernandez") served as a Company director from 2016 until his resignation on February 27, 2018. He also served as a member of the Audit Committee and FOSO Committee. According to the 2017 Proxy Statement, as of March 3, 2017 Defendant Hernandez beneficially owned 930 shares of

16

the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 3, 2017 was $79.49, Hernandez owned approximately $73,925 worth of Edison stock.

62.    For the fiscal year ended December 31, 2017, Defendant Hernandez received $251,576 in compensation from the Company. This included $113,250 in fees earned or cash paid, $135,068 in stock awards, and $3,258 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings.

63.    The Company's 2017 Proxy Statement stated the following about Defendant Hernandez:

> Mr. Hernandez has been the chairman and chief executive officer of Avid Technology, Inc., a digital media company that provides audio and video technology, since 2013, and also served as its president from 2013 to 2016. He has been a director of Avid Technology, Inc. since 2008. From 1999 to 2013, Mr. Hernandez served as chairman and chief executive officer of Open Solutions, Inc., a technology provider for the financial services marketplace. He previously also served in various executive roles at RoweCom Inc. and U.S. Medical Instruments, Inc. and as a director of HSBC North America Holdings Inc. and several of its affiliates. Mr. Hernandez is a graduate of San Diego State University, where he also received his MBA degree.
>
> **Specific Qualifications and Experience Relevant to the Company**
> Mr. Hernandez brings to the Board public company chief executive leadership experience in the multimedia software industry and technology sector. He also brings entrepreneurial, marketing, and product development experience, which is particularly relevant to the Company's new business development activities. Mr. Hernandez's experience in the technology sector is valuable in addressing the challenges of the changing electric industry.

**Defendant Litzinger**

64.    Defendant Ron Litzinger ("Litzinger") has served as the President of the Company's subsidiary Edison Energy Group, Inc. since March 2016. He also served as the Executive Vice President of the Company from October 2014 until March 2016, and the President of SCE from January 2011 until September 2014. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Litzinger beneficially owned 316,585

Verified Shareholder Derivative and Double Derivative Complaint

shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Litzinger owned approximately $19.2 million worth of Edison stock.

65.    For the fiscal year ended December 31, 2017, Defendant Litzinger received $3,752,907 in compensation from the Company. This included $600,000 in fees earned or cash paid, $630,190 in stock awards, $630,004 in option awards, $144,184 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings, and $1,748,529 in all other compensation.

66.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Litzinger made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| May 2, 2014 | 21,706 | $    55.43 | $     1,203,163 |
| May 16, 2016 | 12,677 | $    71.28 | $        903,616 |
| September 12, 2016 | 38,084 | $    72.19 | $     2,749,283 |
| November 15, 2016 | 38,086 | $    69.41 | $     2,643,549 |
| February 15, 2017 | 26,035 | $    74.64 | $     1,943,252 |
| May 15, 2017 | 26,035 | $    78.85 | $     2,052,859 |
| August 15, 2017 | 224,715 | $    80.42 | $   18,071,580 |
| November 15, 2017 | 224,718 | $    82.48 | $   18,534,740 |

Thus, in total, before the fraud was exposed, he sold 612,056 Company shares on inside

Verified Shareholder Derivative and Double Derivative Complaint

information, for which he received approximately $48.1 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

67.     Upon information and belief, Defendant Litzinger is a citizen of the State of California.

**Defendant Morris**

68.     Defendant James T. Morris ("Morris") has served as a Company director since 2016. He also serves as a member of the Audit Committee and Compensation Committee. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Morris beneficially owned 2,086 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Morris owned approximately $126,787 worth of Edison stock.

69.     For the fiscal year ended December 31, 2017, Defendant Morris received $254,382 in compensation from the Company. This included $115,250 in fees earned or cash paid, $135,068 in stock awards, and $4,064 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings.

70.     The Company's 2018 Proxy Statement stated the following about Defendant Morris:

Mr. Morris is the chairman, president and chief executive officer of Pacific Life Insurance Company, and its parent companies Pacific Mutual Holding Company and Pacific LifeCorp. He has served as chief executive officer since 2007 and chairman since 2008, and served as president from 2007 to 2012 and again beginning in 2016. Mr. Morris has served in a variety of management positions since joining Pacific Life in 1982, including chief operating officer from 2006 to 2007, executive vice president and chief insurance officer, life insurance and annuities and mutual funds divisions, from 2005 to 2006, executive vice president, life insurance division, from 2002 to 2005, and senior vice president, individual insurance, from 1996 to 2002. In addition, he has been chairman of the board and trustee of the Pacific Select Fund and the Pacific Funds Series Trust, members of the same mutual fund complex, since 2007. Mr. Morris serves as a director of the American Council of Life Insurers, where he previously served as its

19

Verified Shareholder Derivative and Double Derivative Complaint

chairman from 2012 to 2013. He is a graduate of the University of California at Los Angeles and serves as a member of the Board of Advisors of the UCLA Anderson School of Management.

**Specific Qualifications and Experience Relevant to the Company**
Mr. Morris brings to the Board business and chief executive leadership experience in an industry which, like the electric utility industry, is highly regulated. He also brings strategic perspective, product development, marketing and financial analysis experience to the Board.

71.     Upon information and belief, Defendant Morris is a citizen of the State of California.

**Defendant O'Toole**

72.     Defendant Timothy O'Toole ("O'Toole) has served as a Company director since 2017. He also serves as a member of the FOSO Committee and Compensation Committee. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant O'Toole beneficially owned 5,870 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, O'Toole owned approximately $356,778 worth of Edison stock.

73.     For the fiscal year ended December 31, 2017, Defendant O'Toole received $126,198 in compensation from the Company. This included $58,250 in fees earned or cash paid, $67,521 in stock awards, and $427 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings.

74.     The Company's 2018 Proxy Statement stated the following about Defendant O'Toole:

Mr. O'Toole has been the chief executive officer of First Group plc, a transportation company that provides rail and bus services in the United Kingdom and North America, since 2010. He also serves as a director of First Group plc, which is publicly traded on the London Stock Exchange. Mr. O'Toole is a director of the National Safety Council and previously served as a director of CSX Corporation. He previously served as managing director of the London Underground from 2003 through 2009. Prior to that, Mr. O'Toole served in various senior management roles during his 20 years of service at Consolidated Rail Corporation, including president and chief executive officer from 1998 to 2001. He is a graduate of La Salle University and received his law degree from the University of Pittsburgh.

20

**Specific Qualifications and Experience Relevant to the Company**

Mr. O'Toole brings to the Board public company chief executive leadership experience in a regulated, capital intensive industry. His operational experience in safety, risk and crisis management is particularly relevant to the oversight of our business and strategy.

**<u>Defendant Payne</u>**

75.    Defendant Kevin M. Payne ("Payne") has served as SCE director since 2016. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Payne beneficially owned 80,241 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Payne owned approximately $4.8 million worth of Edison stock.

76.    For the fiscal year ended December 31, 2017, Defendant Payne received $2,770,284 in compensation from the Company. This included $541,346 in fees earned or cash paid, $536,253 in stock awards, $536,253 in option awards, $393,525 in Non-Equity Incentive Plan Compensation, $718,055 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings, and $44,737 in all other compensation.

77.    The Company's 2018 Proxy Statement stated the following about Defendant Payne:

Mr. Payne has been the CEO of SCE since June 2016. Prior to his current role, he served as senior vice president of Customer Service for SCE from 2014 to June 2016. Mr. Payne has held various leadership positions, including Vice President of Engineering and Technical Services from 2011 to 2014, Vice President of Client Services Planning and Controls from 2010 to 2011, Vice President of Information Technology and Business Integration from 2009 to 2010, and Vice President of Enterprise Resource Planning from 2008 to 2009. Prior to that he was a Director in the Renewable and Alternative Power and Major Customer Technical Support departments. Mr. Payne began his career with SCE in 1986 in the Engineering and Construction department managing power plant retrofit and other engineering projects. He has a degree in mechanical engineering from the University of California, Berkeley, and is a registered professional engineer.

**Specific Qualifications and Experience Relevant to the Company**

Verified Shareholder Derivative and Double Derivative Complaint

Mr. Payne brings to the SCE Board in-depth knowledge of the Company's business, experienced leadership, and an engineering background. He also brings senior executive, operations and strategic planning experience developed during his 31 years of service with SCE.

78.     Upon information and belief, Defendant Payne is a citizen of the State of California.

**Defendant Petmecky**

79.     Defendant William M. Petmecky III ("Petmecky") served as Senior Vice President and CFO of the SCE since September 2016. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Petmecky beneficially owned 23,708 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Petmecky owned approximately $1.4 million worth of Edison stock.

80.     For the fiscal year ended December 31, 2017, Defendant Petmecky received $1,172,752 in compensation from the Company. This included $324,808 in fees earned or cash paid, $170,902 in stock awards, $173,151 in Non-Equity Incentive Plan Compensation, $316,908 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings, and $16,200 in all other compensation.

81.     The Company's website stated the following about Defendant Petmecky:
Tres Petmecky is senior vice president and chief financial officer of Southern California Edison (SCE), the utility subsidiary of Edison International and one of the nation's largest electric utilities. He is responsible for the utility company's financial management and fiscal integrity, directing both corporate and business unit financial planning and budgeting, treasury, accounting, tax and risk management.

Prior to his current role, Petmecky was vice president and treasurer of SCE, responsible for the financial operations of the utility. Previously, Petmecky was vice president and treasurer at Edison Mission Energy, a competitive power generation business that was a subsidiary of Edison International at the time.

Petmecky joined SCE in 1995 and has held a variety of management positions, including serving as director of Risk Control at SCE, and director of strategic planning, analysis and corporate finance at Edison International.

22

Verified Shareholder Derivative and Double Derivative Complaint

Before joining SCE, Petmecky was a consultant in the public utility industries services group of PricewaterhouseCoopers, LLC, located in Dallas.

Petmecky is on the board of directors of East Pasadena Water Company, an investor-owned water utility regulated by the California Public Utilities Commission.
He is on the board of directors at Methodist Hospital in Arcadia and was previously a director, and has served as a chairman of the Methodist Hospital Foundation Board. Petmecky serves on the board of directors of the YMCA of Metropolitan Los Angeles.

Petmecky graduated from Southern Methodist University with bachelor's degrees in physics and economics. He earned an MBA from the University of Southern California.

82. Upon information and belief, Defendant Petmecky is a citizen of the State of California.

**Defendant Schlosberg**

83. Defendant Richard T. Schlosberg III ("Schlosberg") served as a Company director from 2002 until his retirement in April 2017. He also served as Chair of the Nominating/Corporate Governance Committee and as a member of the Compensation Committee. According to the 2017 Proxy Statement, as of March 3, 2017, Defendant Schlosberg beneficially owned 44,944 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 3, 2017 was $79.49, Schlosberg owned approximately $3.5 million worth of Edison stock.

84. For the fiscal year ended December 31, 2016, Defendant Schlosberg received $312,150 in compensation from the Company. This included $123.125 in fees earned or cash paid, $135,032 in stock awards, $43,993 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings, and $10,000 in all other compensation.

85. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme

Verified Shareholder Derivative and Double Derivative Complaint

was exposed, Defendant Schlosberg made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 31, 2014 | 1,000 | $  56.01 | $      56,010 |
| May 4, 2015 | 2,500 | $      62.2 | $    155,500 |
| March 23, 2016 | 10,000 | $  71.61 | $    716,100 |

Thus, in total, before the fraud was exposed, he sold 13,500 Company shares on inside information, for which he received approximately $927,610. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

86.    The Company's 2016 Proxy Statement stated the following about Defendant Schlosberg:

> Mr. Schlosberg served as president and chief executive officer of The David and Lucile Packard Foundation, a private family foundation, from 1999 until his retirement in 2004. Prior to joining the foundation, he was publisher and chief executive officer of The Los Angeles Times, and executive vice president and director of The Times Mirror Company, a media communications company. He is a director of the Kaiser Family Foundation and previously served as a director of eBay, Inc. Mr. Schlosberg is a graduate of the United States Air Force Academy, and holds an MBA degree from Harvard Business School.

> **Specific Qualifications and Experience Relevant to the Company**
> Mr. Schlosberg brings to the Board business, management and chief executive leadership experience in the communications industry, including in the local markets served by SCE. His experience is particularly relevant to the Company's operational and service excellence program. He also brings independent leadership, corporate governance and executive compensation experience to the Board as the Company's Governance Committee Chair and previous Lead Director and Compensation Committee Chair. He brings the perspective and insight of a director who has served on other public and private company boards.

Verified Shareholder Derivative and Double Derivative Complaint

**Defendant Scilacci**

87.    Defendant William James Scilacci ("Scilacci") served as the Company's Executive Vice President and CFO until his retirement in September 2016. According to the 2017 Proxy Statement, as of December 21, 2016, Defendant Scilacci beneficially owned 437,607 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on December 21, 2016 was $71.74, Scilacci owned approximately $31.3million worth of Edison stock.

88.    For the fiscal year ended December 31, 2016, Defendant Scilacci received $3,304,041 in compensation from the Company. This included $484,100 in salary, $682,597 in stock awards, $682,508 in option awards, $311,178 in Non-Equity Incentive Plan Compensation, $803,918 in Change in Value and Non-Qualified Deferred Compensation Earnings, and $339,740 in all other compensation.

89.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Scilacci made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| March 31, 2014 | 143,438 | $    56.12 | $   8,049,740 |
| February 26, 2016 | 45,690 | $    67.23 | $   3,071,738 |
| March 8,2016 | 13,174 | $    69.05 | $      909,664 |

Thus, in total, before the fraud was exposed, he sold 202,302 Company shares on inside information, for which he received approximately $12 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

90.    Upon information and belief, Defendant Scilacci is a citizen of the State of California.

Verified Shareholder Derivative and Double Derivative Complaint

**Defendant Stuntz**

91.     Defendant Linda G. Stuntz ("Stuntz") has served as a Company director since 2014. She also serves as Chair of the Nominating/Corporate Governance Committee and as a member of the FOSO Committee. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Stuntz beneficially owned 1,824 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Stuntz owned approximately $110,862 worth of Edison stock.

92.     For the fiscal year ended December 31, 2017, Defendant Stuntz received $273,744 in compensation from the Company. This included $126,500 in fees earned or cash paid, $135,068 in stock awards, $4,676 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings, and $7,500 in all other compensation.

93.     The Company's 2018 Proxy Statement stated the following about Defendant Stuntz:

> Ms. Stuntz has been a partner of the law firm of Stuntz, Davis & Staffier, P.C. since 1995. Her practice includes energy and environmental regulation. Ms. Stuntz previously served as Deputy Secretary of, and held senior policy positions in, the U.S. Department of Energy from 1989 to 1993, and served as associate minority counsel and minority counsel to the Energy and Commerce Committee of the U.S. House of Representatives from 1981 to 1987. She is a director of Royal Dutch Shell plc, and previously served as a director of Raytheon Company, Schlumberger, Ltd. and American Electric Power Company. Ms. Stuntz also previously served on the U.S. Secretary of Energy Advisory Board during 2015 and 2016. She is a graduate of Wittenberg University and received her law degree from Harvard University.
>
> **Specific Qualifications and Experience Relevant to the Company**
> Ms. Stuntz brings to the Board utility and environmental law and public policy experience, which is particularly relevant to the Company's business. Her experience as a director of other public companies, including in the energy and electric utilities industries, also brings value to the Board.

26

Verified Shareholder Derivative and Double Derivative Complaint

**Defendant Sullivan**

94.     Defendant William P. Sullivan ("Sullivan") has served as a Company director since 2015. He also serves as Chair of the Board, and a member of the Nominating/Corporate Governance Committee and the FOSO Committee. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Sullivan beneficially owned 6,672 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Sullivan owned approximately $405,524 worth of Edison stock.

95.     For the fiscal year ended December 31, 2017, Defendant Sullivan received $377,250 in compensation from the Company. This included $179,750 in fees earned or cash paid and $197,500 in stock awards.

96.     The Company's 2018 Proxy Statement stated the following about Defendant Sullivan:

> Mr. Sullivan served as chief executive officer of Agilent Technologies, a global provider of scientific instruments, software, services and consumables in life sciences, diagnostics and applied chemical markets, from 2005 to 2015. In addition, he was Agilent's president from 2005 to 2012 and 2013 to 2014. Prior to that, Mr. Sullivan was executive vice president and chief operating officer of Agilent from 2002 to 2005. He had been senior vice president and general manager of Agilent's Semiconductor Products Group from 1999 to 2002. Before 1999, Mr. Sullivan served in various management roles, including in manufacturing and product development, at Hewlett-Packard Company. He serves as a director of Maxim Integrated and previously served as a director of Agilent Technologies, Avnet, Inc. and URS Corporation. Mr. Sullivan is a graduate of the University of California, Davis.

> **Specific Qualifications and Experience Relevant to the Company**
> Mr. Sullivan brings to the Board experience as president and chief executive officer of a large public company. He also brings significant operational experience, including leadership of successful company transformation. This experience, particularly in the technology sector and in product and business development, is very valuable to the Board in the changing electric industry.

Verified Shareholder Derivative and Double Derivative Complaint

97.     Upon information and belief, Defendant Sullivan is a citizen of the State of California.

**Defendant Tauscher**

98.     Defendant Ellen O. Tauscher ("Tauscher") has served as a Company director since 2013. She also serves as Chair of the FOSO Committee and a member of the Nominating/Corporate Governance Committee. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Tauscher beneficially owned 4,296 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Tauscher owned approximately $261,110 worth of Edison stock.

99.     For the fiscal year ended December 31, 2017, Defendant Tauscher received $274,636 in compensation from the Company. This included $128,500 in fees earned or cash paid, $135,068 in stock awards, $1,068 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings, and $10,000 in all other compensation.

100.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Tauscher made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 14, 2016 | 3,012 | $   71.87 | $    216,472 |

Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

101.    The Company's 2018 Proxy Statement stated the following about Defendant Tauscher:

Ms. Tauscher serves on the University of California Board of Regents and is Chair of the Boards of Governors of Los Alamos National Security, LLC and Lawrence Livermore National Security, LLC. She has been a strategic

28

advisor with the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC since 2012. Ms. Tauscher served as Under Secretary of State for Arms Control and International Security from 2009 to 2012. Prior to joining the State Department, she served from 1997 to 2009 as a member of the U.S. House of Representatives from California's 10th Congressional District. While a member of Congress, Ms. Tauscher served on the House Armed Services Committee, the House Transportation and Infrastructure Committee and as Chairman of the House Armed Services Subcommittee on Strategic Forces. Prior to serving in Congress, she worked in investment banking and the financial industry in various roles for Bache Halsey Stuart Shields, Bear Stearns & Co., and Drexel Burnham Lambert, and as an officer of the American Stock Exchange. Ms. Tauscher is a director of eHealth, Inc. and previously served as a director of Invacare Corporation and Sea World Entertainment, Inc. She also previously served on the U.S. Secretary of Energy Advisory Board. Ms. Tauscher is a graduate of Seton Hall University.

**Specific Qualifications and Experience Relevant to the Company**
Ms. Tauscher brings to the Board extensive government affairs and public policy experience, which is particularly relevant to the Company's business and valuable in assessing the Company's strategy. She also brings business and financial acumen. Her experience in national security and in the State Department and in Congress is particularly valuable in the oversight of cybersecurity risk and her role as the Board's liaison to the Company's cybersecurity oversight group.

102.   Upon information and belief, Defendant Tauscher is a citizen of the State of California.

**Defendant Taylor**

103.   Defendant Peter J. Taylor ("Taylor") has served as a Company director since 2011. He also serves as Chair of the Audit Committee and a member of the Compensation Committee. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant Taylor beneficially owned 3,686 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2018 was $60.78, Taylor owned approximately $224,035 worth of Edison stock.

Verified Shareholder Derivative and Double Derivative Complaint

104.   For the fiscal year ended December 31, 2017, Defendant Taylor received $275,318 in compensation from the Company. This included $135,250 in fees earned or cash paid, $135,068 in stock awards, and $5000 in all other compensation.

105.   The Company's 2018 Proxy Statement stated the following about Defendant Taylor:

> Mr. Taylor has been the president of ECMC Foundation, a nonprofit corporation dedicated to educational attainment for low-income students, since May 2014. Prior to that he served as executive vice president and chief financial officer of the University of California from 2009 to 2014 and managing director of public finance at Lehman Brothers and Barclays Capital from 2002 to 2009. Mr. Taylor is a director of Pacific Mutual Holding Company and the Kaiser Family Foundation, and a member of the Board of Trustees of California State University. Previously, he was chair of the UCLA African American Admissions Task Force and a commissioner on the California Performance Review Commission. Mr. Taylor is a graduate of the University of California Los Angeles and holds a Master's degree in public policy analysis from Claremont Graduate University.
>
> **Specific Qualifications and Experience Relevant to the Company**
> Mr. Taylor brings to the Board finance and public policy experience, which is particularly relevant to the Company's infrastructure investment strategy and highly regulated business. He also brings experience in risk management, accounting and financial reporting, which is valuable in his role as a financial expert and Chair of the Audit Committee.

106.   Upon information and belief, Defendant Taylor is a citizen of the State of California.

### Defendant White

107.   Defendant Brett White ("White") has served as a Company director since 2007. He also serves as Chair of the Compensation Committee and a member of the Nominating/Corporate Governance Committee. According to the 2018 Proxy Statement, as of March 1, 2018, Defendant White beneficially owned 34,580 shares of the Company's common stock. Given that the price per share of the Company's common

Verified Shareholder Derivative and Double Derivative Complaint

stock at the close of trading on March 1, 2018 was $60.78, White owned approximately $2.1 million worth of Edison stock.

108.   For the fiscal year ended December 31, 2017, Defendant White received $302,179 in compensation from the Company. This included $130,750 in fees earned or cash paid, $135,068 in stock awards, and $36,361 in Change in Pension Value and Non-Qualified Deferred Compensation Earnings.

109.   During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant White made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| June 7, 2017 | 2,500 | $   81.67 | $    204,175 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

110.   The Company's 2018 Proxy Statement stated the following about Defendant White:

> Mr. White has been chairman and chief executive officer of Cushman & Wakefield (formerly DTZ), a commercial real estate services company, since September 2015. He served as executive chairman of DTZ from March 2015 to September 2015. Mr. White previously served as a senior advisor to TPG Capital, a private equity firm, from July 2014 to December 2014 and as a managing partner at Blum Capital, a private equity firm, from January 2013 to December 2013. Prior to that, he served as chief executive officer of CBRE Group, Inc., a commercial real estate services firm, from 2005 to 2012, president of CBRE Group from 2001 to 2010 and, prior to that, as chairman of the Americas of CB Richard Ellis Services, Inc. Mr. White previously served as a director of Ares Commercial Real Estate Corporation, CBRE Group, Inc. and Realogy Holdings Corporation. He is a graduate of the University of California, Santa Barbara.
>
> **Specific Qualifications and Experience Relevant to the Company**

Verified Shareholder Derivative and Double Derivative Complaint

Mr. White brings to the Board the experience, strategic perspective, critical judgment and analytical skills of a chief executive officer of a global company. His real estate services industry experience is particularly relevant to the Company's infrastructure investment strategy. He also brings the perspective of a business headquartered and doing business in the local markets served by SCE developed from his years of service at CBRE Group. This experience is valuable in Mr. White's role as the Company's Compensation Committee Chair.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

111. By reason of their positions as officers, directors, and/or fiduciaries of Edison and because of their ability to control the business and corporate affairs of Edison, the Individual Defendants owed Edison and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Edison in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Edison and its shareholders so as to benefit all shareholders equally.

112. Each director and officer of the Company owes to Edison and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

113. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Edison, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

114. To discharge their duties, the officers and directors of Edison were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

115. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein

Verified Shareholder Derivative and Double Derivative Complaint

involves a knowing and culpable violation of their obligations as directors and officers of Edison, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Edison's Board at all relevant times.

116.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

117.   To discharge their duties, the officers and directors of Edison were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Edison were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to Edison's own Employee Code of Conduct;

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its

business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Edison conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Edison and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Edison's operations would comply with all applicable laws and Edison's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

118.  Each of the Individual Defendants further owed to Edison and the shareholders the duty of loyalty requiring that each favor Edison's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

119.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Edison and were at all times acting within the course and scope of such agency.

120.   Because of their advisory, executive, managerial, and directorial positions with Edison, each of the Individual Defendants had access to adverse, non-public information about the Company.

121.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Edison.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

122.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

123.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act.

124.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Edison, was a

35

direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

125.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

126.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Edison and was at all times acting within the course and scope of such agency.

## EDISON'S CODE OF CONDUCT

127.   The Company's Employee Code of Conduct (the "Code of Conduct"), states that: "Each of us is required to understand and follow this Code, our policies and the laws and regulations applicable to our business."

128.   The Code of Conduct provides, under the section titled, "Safety," that:
Safety is integral to everything we do at Edison — lives depend on it. Safety is a personal commitment that we act upon so that we all return home free from harm at the end of every day. You are empowered and expected to speak up and stop work if you become aware of any unsafe working condition.

To support a safe work environment, we do not engage in any violent, threatening or bullying behavior. Weapons, unless authorized as part of your job, are not permitted. You are required to show up and perform work **fit for duty**.

Our commitment to safety extends beyond our own employees. We also work to protect the environment and the safety of our business partners and the public. Everyone is expected to speak up and stop work if there is an imminent hazard to anyone's safety or the environment.

Verified Shareholder Derivative and Double Derivative Complaint

129.   The Code of Conduct provides under "Insider Trading," that: "[c]ertain information about our company can impact its stock price. We comply with securities laws by refraining from buying or selling securities, either directly or indirectly, while in possession of material, non-public information and from sharing this type of information with others." In defining material non-public information, the Code of Conduct states that: "information, whether positive or negative, is considered material if a reasonable investor would consider it important when deciding whether to buy or sell securities or if it is likely to affect the price of securities. Information is considered non-public if it has not been broadly disclosed to the general public or has been only partially disclosed."

130.   The Code of Conduct contains a section on the Company's record keeping policy which states, "We take care to ensure the integrity of our business records, whether hardcopy or electronic. You are expected to create accurate and complete records, including those that document the company's financial and operational performance, and to retain records pursuant to the company's retention policies."

131.   The Code of Conduct acknowledges Utility Regulations, stating in relevant part:

> Our utility company, Southern California Edison, is subject to state and federal regulations covering a wide range of topics. In compliance with all of these regulations, our utility employees take steps to ensure the reliability of our electricity infrastructure, maintain separation between our transmission operations and our energy marketing and procurement operations, and oversee the transactions between our utility and affiliate companies to prevent any preferential treatment.

132.   The Code of Conduct also contains a section on "External Communications" which states:

> Recognizing that the information we communicate helps our stakeholders make informed decisions, we work to ensure our public statements are accurate and consistently voiced in all forms of communication. We limit official company communication to authorized spokespersons and encourage you to make it clear in your personal communications that you're not speaking on behalf of the company.

Verified Shareholder Derivative and Double Derivative Complaint

## EDISON'S SUPPLEMENTAL CODE OF CONDUCT

133.   The Company has also adopted a Supplemental Code of Conduct entitled "Ethics and Compliance Code for Directors" (the "Supplemental Code of Conduct"), which applies to directors of the Company and its subsidiaries.

134.   The purpose of the Supplemental Code of Conduct is to:

outline the manner in which Directors of Edison International and its subsidiaries (the "Company") should conduct themselves so as to avoid conflicts between their financial, business and other activities and their responsibilities as members of the Board(s) of the Company. It also outlines those Company policies that are applicable to Directors and articulates the Company's commitment to compliance with all applicable laws and regulations.

135.   Individuals covered by the Supplemental Code of Conduct have additional specific obligations, which include:

**1. CONFLICTS OF INTEREST**

Directors are expected to avoid any actual conflicts of interest between them and the Company. In addition, Directors should also avoid even the appearance of a conflict of interest.

Situations, including those with suppliers, contractual counterparties, competitors or charitable organizations, where a Director may have a personal interest or potential gain that is inconsistent with the Company's best interests or make it difficult for the Director to exercise objective judgment may involve a conflict of interest. Conflicts of interest may also arise when a Director, or member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company.

Any situation that involves or appears to involve a conflict or potential conflict of interest should be disclosed promptly to the Chair of the Board and the CECO or General Counsel, and in any event, the Director shall not participate in any Board decision that in any way relates to the matter that gives rise to the conflict of interest.

**2. COMPLIANCE WITH APPLICABLE LAWS**

Verified Shareholder Derivative and Double Derivative Complaint

Directors must conduct all their financial, business and other activities in full compliance with applicable laws, rules and regulations. In addition, Directors must adhere to applicable portions of the following Company policies: Records Management, Disclosure, Anti-Corruption, Insider Trading, Prohibition of Harassment, Including Sexual Harassment, and other policies as may be adopted and identified to them from time to time by the CECO or Company General Counsel.

## 3. CORPORATE OPPORTUNITY

Directors are prohibited from (a) taking for themselves opportunities related to the Company's business; (b) using the Company's corporate property, information or position for personal gain; or (c) competing with the Company for business opportunities; provided however, that if the Company's "disinterested Directors," as defined by applicable law, determine that the Company will not pursue an opportunity related to the Company's business, a Director may do so.

## 4. CONFIDENTIALITY

Directors must protect the confidentiality of all confidential information entrusted to them, except when disclosure is authorized or legally mandated. Confidential information concerning the Company may not be used for personal gain or in violation of any applicable law, regulations or Company policies, including insider trading laws, regulations and policies. For purposes of this Code, "confidential information" includes all information that might be of use to competitors, analysts, or harmful to the Company, its shareholders or its customers, if disclosed, that the Company has not yet released.

## 5. FAIR DEALING

Directors shall endeavor to deal fairly with the Company's employees, customers, suppliers and competitors. Directors shall not take unfair advantage through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

## 6. PROTECTION AND PROPER USE OF PROPERTY

Verified Shareholder Derivative and Double Derivative Complaint

Directors shall protect the Company's assets and ensure their efficient use. All Company assets shall be used for legitimate business purposes.

## 7. COMPLIANCE PROCEDURES

If a Director becomes aware of facts that would cause a Director (including himself or herself) to be in violation of this Code, the Director shall promptly inform the Chair of the Board and the CECO or the General Counsel. Following any substantiation of allegations, appropriate action will be determined by the Board or a duly authorized Board member or Committee.

## 8. ENCOURAGING THE REPORTING OF ANY ILLEGAL OR UNETHICAL BEHAVIOR

Directors should promote ethical behavior and take steps to ensure that the Company: (a) encourages employees to talk to supervisors, managers, Ethics and Compliance or the Edison HelpLine when in doubt about the best course of action in a particular situation; (b) encourages employees to report violations of law, rules, regulations or the Company's Employee Code of Conduct to their supervisor, manager, Ethics and Compliance, or the Edison HelpLine; and (c) informs employees that the Company does not tolerate retaliation against anyone who comes forward with a question or concern.

136. The Individual Defendants violated the Code of Conduct and the Supplemental Code of Conduct (the "Codes") by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

137. Edison International is a public utility holding company that operates through its subsidiaries to generate and distribute electricity and energy to customers across Southern California.

Verified Shareholder Derivative and Double Derivative Complaint

The Company has been the subject of multiple investigations involving the CPUC and other regulatory bodies for faulty equipment, failing to maintain its facilities in compliance with state safety laws, and on occasion, for engaging in *ex parte* communications during a purported settlement agreement relating to the shutdown of San Onofre in June 2013.

138.   As a California company, Edison is required to comply with relevant state laws pertaining to the maintenance and safety of its utilities. For example, California Public Resources Code Section 4292 requires:

> Except as otherwise provided in Section 4296, any person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for fire protection of such areas, maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower.[4]

139.   Furthermore, Edison is also regulated by the CPUC, and as such, must comply with CPUC regulations related to facilities. For example, CPUC General Order 165 requires extensive inspections and patrol inspections over overhead facilities every year in some instances, especially in "Very High Fire" areas such as Ventura County, California.[5]

140.   CPUC also has specific rules pertaining to rate-setting. These proceedings are designed to determine the amount a utility can charge its customers. The proceedings are administrative and employ certain rules and procedures. The actions are assigned to administrative judges who handle the discussions. Ultimately, CPUC must approve any agreement that interested parties choose to negotiate and settle upon. CPUC prohibits

---

[4] http://www.search-california-law.com/research/ca/PRC/4292./Cal-Pub-Res-Code-Section-4292/text.html. Last visited January 22, 2019.
[5] http://docs.cpuc.ca.gov/PUBLISHED/GENERAL_ORDER/159182.htm. Last visited January 22, 2019.

certain *ex parte* communications between interested persons during these proceedings unless those communications meet specific rules, including notice requirements.[6]

**The Ex Parte Misconduct**

141.   Around October 2012, design flaws led to an internal radioactive steam leak at one of the Company's nuclear power plants, San Onofre. The CPUC launched an investigation to determine Edison's fault in the leak and the amount the Company would be able to recover through charging its ratepayers for consequential costs. To avoid an official write up determining Edison's fault, the Company was given the opportunity to enter into a settlement agreement, to be approved by CPUC, with the interested parties i.e. representatives of the ratepayers.

142.   The Company decided to shut the power plant down in June 2013, a process that would require billions of dollars and several years. As part of CPUC procedures relating to cost allocation breakdowns, the Company could enter into settlement discussions with interested parties to negotiate charges that could be passed on to ratepayers, contingent on CPUC approval. Unbeknownst to the interested parties and the investing public, the Company engaged in multiple settlement discussions with CPUC members from early 2013 into June 2014.

143.   On March 20, 2014, Edison announced that it was entering settlement negotiations with interested parties involved in the shutdown of San Onofre. The announcement was viewed as a positive step towards resolving what had become the San Onofre cloud over the Company and in line with the disclosure, the price per share of Company stock increased from closing at $44.45 on March 20, 2014 to close at $46.03 on March 21, 2014. During these announcements, the Company failed to disclose that it had already engaged in several discussions with CPUC regarding the details of a settlement in the absence of ratepayer representatives.

144.   By early 2015, ongoing investigations by the California Attorney General's Office and the CPUC uncovered the Ex Parte Misconduct. As details about the *ex parte*

---

[6] http://www.cpuc.ca.gov/exparte_communications/. Last visited January 22, 2019.

Verified Shareholder Derivative and Double Derivative Complaint

discussions came to light, the Company's stock price declined. Around August 10, 2015, when news outlets reported that the settlement the Company had previously announced had unraveled, the stock price dropped from averaging at around $67 per share to closing at $59 per share on August 11, 2015.

145.   The Individual Defendants made and/or caused the Company to engage in the Ex Parte Misconduct, which violated CPUC rate-setting procedures and caused a decline in the value of the Company, specifically when the details of the secret communications came to light and led to the unravelling of what had become the San Onofre settlement between the Company and interested parties.

**False and Misleading Statements as to the Ex Parte Misconduct**

***March 20, 2014 Form 8-K Press Release***

146.   On March 20, 2014, the Company issued a press release filed with the SEC on a Form 8-K announcing that Edison was entering into settlement discussions to address the CPUC investigation into the shutdown of San Onofre. The 8-K stated:

> Under rules of the California Public Utilities Commission ("CPUC"), prior to signing any settlement, settling parties must provide notice and convene at least one conference for the purpose of providing all parties with the opportunity to discuss settlements in the proceeding. Pursuant to these rules, on March 20, 2014, Southern California Edison Company ("SCE"), San Diego Gas & Electric Co. ("SDG&E"), The Utility Reform Network, and the CPUC Office of Ratepayer Advocates ("ORA") (together, the "Parties") jointly gave seven days advance
>
> written notice (the "Notice") to all parties in the San Onofre OII of a conference to discuss terms to resolve the CPUC's proceedings regarding the outages and subsequent permanent shutdown of the San Onofre Nuclear Generating Station Units 2 and 3, I. 12-10-013 and related proceedings. At the same time, the Parties sent a letter to the Administrative Law Judges presiding over the OII requesting a stay of proceedings pending the outcome of the settlement conference. Any
>
> such settlement conference is confidential and limited to the parties in the proceeding and their representatives.
>
> \* \* \*
>
> ***The Notice is related to settlement discussions that have been held directly among the Parties***. Under the CPUC's rules, the terms discussed by the Parties are confidential and may not be disclose outside the negotiations

Verified Shareholder Derivative and Double Derivative Complaint

without the consent of all Parties participating in the negotiations. Consequently, except for discussions at the confidential settlement conference, the settlement terms discussed by the Parties will be maintained as confidential unless the Parties mutually agree to publicly release the terms or unless and until a formal settlement agreement has been signed, as to which no assurance can be given.

### March 27, 2014 Press Release and Conference Call

147.   On March 27, 2014, the Company issued a press release formally announcing a settlement agreement regarding the San Onofre shutdown. The press release stated:

> On March 27, 2014, SCE entered into a Settlement Agreement with The Utility Reform Network ("TURN"), the Office of Ratepayer Advocates ("ORA") of the California Public Utilities Commission ("CPUC") and San Diego Gas & Electric Company ("SDG&E"). If implemented, the Settlement Agreement will constitute a complete and final resolution of the CPUC's Order Instituting Investigation ("OII") and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at the San Onofre Nuclear Generating Station ("San Onofre") and the related outage and subsequent shutdown of San Onofre. The Settlement Agreement does not affect proceedings before the Nuclear Regulatory Commission or proceedings related to recoveries from third parties described below. The Settlement Agreement was signed following an all-party settlement conference in the OII, which was required under CPUC rules as a condition to a settlement.

148.   The same day the Company had a conference call to discuss the settlement. Defendant Craver stated during the call that "[t]his agreement resolves all matters related to the order instituting investigation involving the San Onofre nuclear generating station."

### April 29, 2014 Form 10-Q and Conference Call

149.   On April 29, 2014, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2014 stating: "If implemented, the Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre."

150.   The same day, Edison held a conference call in which Defendants Craver, Scilacci, and Litzinger participated in. Defendant Craver stated on the call that, "[t]he

Verified Shareholder Derivative and Double Derivative Complaint

significant progress made in resolving SONGS . . . should allow investors to focus on Edison International's long-term earnings and dividend growth."

151.   Attached to the Form 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Craver, Litzinger, and Scilacci attesting to the accuracy of the Form 10-Q.

### *May 28, 2014 Stanford C Bernstein Strategic Decisions Conference*

152.   On May 28, 2014, Defendant Craver discussed the San Onofre settlement at a conference. He stated in response to a question about the probability of CPUC approval of the settlement that, "[W]e primarily negotiated that with the principal consumer advocacy groups of TURN and ORA, those are really the ones that are critical for anything that involves impacts on rates."

### *July 31, 2014 Form 10-Q and Conference Call*

153.   On July 31, 2014, the Company filed its quarterly report with the SEC on Form 10-Q for the period ended June 30, 2014 stating: "If implemented, the San Onofre OII Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and related outage and subsequent shutdown of San Onofre."

154.   During a conference call the same day in which Defendants Craver, Litzinger, and Scilacci participated in, Defendant Craver stated:

> All the intervenors who are going to provide testimony have done so, and that was really what I was capturing there. In terms of the direct signatories, it's the two utilities, the labor group [Coalition of California Utility Employees], ORA, TURN, and Friends of the Earth. So those were the direct signatories, representing all four of the main intervener groups. In the testimony, several other groups – mostly consumer, various forms of consumer-related groups – also provided positive, supportive testimony of the settlement. And, as I indicated in my comments, really relatively few came forward with any opposition to the settlement. So, I think basically everyone who has standing that wants to speak, has spoken. And at this point, really all that part is over with. We're really at the stage of waiting for the ALJ Proposed Decision.

Verified Shareholder Derivative and Double Derivative Complaint

155.   Attached to the Form 10-Q were SOX certifications signed by Defendants Craver, Litzinger, Rigatti, and Scilacci attesting to the accuracy of the Form 10-Q.

### October 28, 2014 Form 10-Q

156.   On October 28, 2014, the Company filed its quarterly report with the SEC on Form 10-Q for the period ended September 30, 2014 stating:

> Restated Settlement Agreement (the "San Onofre OII Amended Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA"), SDG&E, the Coalition of California Utility Employees ("CUE"), and Friends of the Earth ("FOE") (together, the "Settling Parties"). If implemented, the San Onofre OII Amended Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre. The Settling Parties agreed to amend the Settlement Agreement that was originally entered into in March 2014 in response to an Assigned Commissioner's and Administrative Judges' Ruling that was issued on September 5, 2014.

157.   Attached to the Form 10-Q were SOX certifications signed by Defendants Craver, Pizarro, Rigatti, and Scilacci attesting to the accuracy of the Form 10-Q.

### November 20, 2014 Press Release

158.   On November 20, 2014, the Company issued a press release stating that the settlement had achieved CPUC approval and that "This settlement resolves all issues regarding the public utilities commission investigation of San Onofre in a fair and reasonable manner . . . ."

159.   The statements in ¶¶ 146-158 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company engaged in and/or allowed the Ex Parte Misconduct; (2) the Company was not abiding by applicable rules with respect to the settlement discussions surrounding the shutdown of San Onofre; (3) the Company was making false representations regarding the resolution of the San Onofre dispute; (4) the Company

Verified Shareholder Derivative and Double Derivative Complaint

failed to maintain internal controls; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge as to the Ex Parte Misconduct

*February 9, 2015 Disclosure of Ex Parte Communications*

160. Upon learning of an upcoming publication detailing the *ex parte* communication, Edison filed a late notice regarding the *ex parte* discussions, over two years after the communications took place. The Company attributed the late disclosure to revised policies and Edison's desire to "avoid close calls when it comes to compliance."

*February 24, 2015 Form 10-K and Conference Call*

161. On February 24, 2015, the Company filed its annual report with the SEC on Form 10-K. The report stated:

> On November 20, 2014, the CPUC approved the Amended and Restated Settlement Agreement (the "San Onofre OII Settlement Agreement") that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth (together, the "Settling Parties"). The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project at San Onofre and the related outage and subsequent shutdown of San Onofre.

162. During a conference call the same day, Defendant Craver stated with respect to the *ex parte* communications:

> in terms of affecting the business, I would say it doesn't really have a significant effect on the business. This is a fairly arcane area. But I would just say, generally speaking, the ex parte rules, particularly on matters like the San Onofre matter, the OII, that's really designed to provide equal access to all parties to the proceeding with equal time. So it's I think one of the misconceptions is in something like SONGS OII that you are precluded from having conversations. You're not. It's just the rules are designed to make sure that if we have conversations with decisionmakers, that those are noticed, that those –that we include in there how much time we spent with which decisionmaker, so that all the other parties have equal access, equal amount of time. That's the whole concept behind it. So I don't see any of this as hurting the ability to do business. It's complicated and cumbersome, and sometimes kind of difficult on the interpretation of some of the specific provisions. But, fundamentally, when we have proceedings before the

Verified Shareholder Derivative and Double Derivative Complaint

Commission, we follow the rules. We go about doing the business the way it's really set up to do it. There's plenty of opportunity in all of those proceedings for all parties to be heard. That's the point of having these things before the Commission. So I don't see any big element there.

163.   The statements in ¶¶ 160-162 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was not abiding by applicable rules with respect to the settlement discussions surrounding the shutdown of San Onofre; (2) the Company was making false representations regarding the resolution of the San Onofre dispute; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges as to the Ex Parte Misconduct**

164.   On April 10, 2015, the *ex parte* communications were filed with a federal class action against the CPUC related to the San Onofre shutdown, *Citizens Oversight, Inc. v. California Public Utilities*. The next day, April 11, 2015, an article discussing prominent similarities between the filed *ex parte* discussions and the actual settlement terms was published in The San Diego Union-Tribune.

165.   On April 14, 2014, the CPUC ordered SCE to deliver all documents connected to the San Onofre settlement discussions from March 2013 and November 2014.

166.   Over the next several months, additional information was revealed to the public relating to the *ex parte* discussions culminating in the withdrawal of rate-representatives from the San Onofre settlement agreement on August 10, 2015.

**The Facilities Misconduct**

167.   On December 4, 2017, wildfires ignited across Southern California, beginning one of the largest and detrimental wildfires in California's modern history. The 2017 Fire, carried by heavy winds, spread over 280,000 acres of land, engulfing thousands of homes, buildings, and structures as it went, and spreading throughout Ojai, Santa Paula, Fillmore, Ventura, and Santa Barbara counties. The 2017 Fire lasted over

Verified Shareholder Derivative and Double Derivative Complaint

month and was finally fully contained in January 2018. However, due to rainfall mixing with the eroded earth, the ensuing Mudslides caused further destruction.

168.   The 2017 Fire and Mudslides caused over $2 billion worth of damages and took the lives of at least twenty-one people. Subsequent investigations by CPUC into the cause of the 2017 Fire pointed to the Company as being at least partially responsible, with several witnesses attesting to an explosion of one of SCE's electric poles in the area where one of the fires began. Power outages further hindered the ability of firefighters on the scene to quell the fire due to inoperable water fire hydrants. As a result of the CPUC investigations into whether the Company was a prudent manager of its facilities, the Company's stock price fell over the course of the 2017 Fire.

169.   Prior to the 2017 Fire, the stock price was around $75 per share. However, on December 5, 2017, the day after the 2017 Fire began, the price of the Company's stock closed at 66.68 and has further dropped since.

170.   On November 8, 2018, the 2018 Fires ignited. Collectively, they destroyed over 98,000 acres of land. CPUC soon after began investigating SCE on November 12, 2018, to assess its compliance with required safety regulations in the fire-impacted areas.

171.   Following the CPUC's investigation announcement, on November 12, 2018, the Company's stock price fell more than 12% to close at $53.56 per share. The Company's stock price continued to drop as the fires persisted. By November 15, 2018, the stock price closed at $47.19, dropping about 32% from the CPUC investigation announcement.

172.   The Individual Defendants made and/or caused the Company to operate in violation of state safety regulations, thereby increasing the risk of wildfire occurrence in California by failing to maintain their facilities appropriately and failing to remediate areas that the Individual Defendants were aware had been the subject and focus of numerous investigations in the past.

173.   Although the Company repeatedly claimed that safety was a top priority for them, they consistently failed to maintain their facilities in accordance with state safety standards, thereby placing the Company and the public at heightened risk for wildfires

and other dangers the Company acknowledged were inherit in the operation of their electricity utility. After the 2018 Fires, CPUC launched investigations into SCE's facilities alerted by an incident report filed by SCE suggesting a circuit malfunction near the site where the 2018 Fires began.

174.   In a letter addressed to CPUC released by the Company on December 6, 2018, Edison stated that investigations were ongoing and that initial investigations revealed a "guy wire" in the facilities which could have caused the circuit malfunction the day the 2018 Fires began. The letter also stated that other potential causes for the relay to the circuit were "weather, debris, vegetation, design, construction, operations, and maintenance."[7]

**False and Misleading Statements as to the Facilities Misconduct**

***February 23, 2016 Form 10-K***

175.   On February 23, 2016, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2015 on a Form 10-K (the "2016 10-K"), which was signed by Individual Defendants Bindra, Chang, Craver, Pizarro, Schlosberg, Stuntz, Sullivan, Tauscher, Taylor, and White.

176.   The 2016 10-K recognized that the Company's operations, specifically with respect to SCE's operations were regulated by, *inter alia*, the CPUC. The 2016 10-K outlined CPUC's authority over SCE, noting that: "[t]he CPUC has the authority to regulate, among other things, retail rates, energy purchases on behalf of retail customers, SCE capital structure, rate of return, issuance of securities, disposition of utility assets and facilities, oversight of nuclear decommissioning funding and costs, and aspects of the transmission system planning, site identification and construction, including safety."

177.   The 2016 10-K propagated the Company's prioritization of safety in its investment approach, stating that, "SCE is investing in and strengthening its electric grid and driving operational and service excellence to improve system safety, reliability and service while controlling costs and rates."

---

[7] https://www.edison.com/content/dam/eix/documents/woolsey_letter_to_cpuc.pdf. Last visited January 22, 2019.

50

178.   Under "Operating Risks," the 2016 10-K acknowledged certain risks specifically relating to the dangers of the Company's business operations to people and property:

*The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.*

Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant. The CPUC has increased its focus on public safety issues with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.

179.   In addition, the Company outlined financial risks connected to the Company's possible association with wild-fires such as insufficient insurance coverage, stating specifically that:

*Weather-related incidents and other natural disasters could materially affect SCE's financial condition and results of operations.*

Weather-related incidents and other natural disasters, including storms, wildfires and earthquakes, can disrupt the generation and transmission of electricity, and can seriously damage the infrastructure necessary to deliver power to SCE's customers. These events can lead to lost revenues and increased expenses, including higher maintenance and repair costs. They can also result in regulatory penalties and disallowances, particularly if SCE encounters difficulties in restoring power to its customers on a timely basis. These occurrences could materially affect SCE's business, financial condition and results of operations, and the inability to restore power to SCE's customers could also materially damage the business reputation of SCE and Edison International.

* * *

Verified Shareholder Derivative and Double Derivative Complaint

***SCE's insurance coverage for wildfires arising from its ordinary operations may not be sufficient.***

Edison International has experienced increased costs and difficulties in obtaining insurance coverage for wildfires that could arise from SCE's ordinary operations. In addition, the insurance that has been obtained for wildfire liabilities may not be sufficient. Uninsured losses and increases in the cost of insurance may not be recoverable in customer rates. A loss which is not fully insured or cannot be recovered in customer rates could materially affect Edison International's and SCE's financial condition and results of operations. Furthermore, insurance for wildfire liabilities may not continue to be available at all or at rates or on terms similar to those presently available to Edison International.

* * *

*Wildfire Insurance*

Severe wildfires in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of the failure of electric and other utility equipment. Invoking a California Court of Appeal decision, plaintiffs pursuing these claims have relied on the doctrine of inverse condemnation, which can impose strict liability (including liability for a claimant's attorneys' fees) for property damage. Prolonged drought conditions in California have also increased the risk of severe wildfire events. On June 1, 2015, Edison International renewed its liability insurance coverage, which included coverage for SCE's wildfire liabilities up to a $610 million limit (with a self-insured retention of $10 million per wildfire occurrence). Various coverage limitations within the policies that make up this insurance coverage could result in additional self-insured costs in the event of multiple wildfire occurrences during the policy period (June 1, 2015 to May 31, 2016). SCE also has additional coverage for certain wildfire liabilities of $390 million, which applies when total covered wildfire claims exceed $610 million, through June 14, 2016. SCE may experience coverage reductions and/or increased insurance costs in future years. No assurance can be given that future losses will not exceed the limits of SCE's insurance coverage.

180.   The 2016 10-K further outlined previous occasions where the Company's malfunctioning equipment resulted in several fires in California. Investigations revealed that service interruptions led to the fires and were themselves a result of inadequate management oversight of certain systems:

Verified Shareholder Derivative and Double Derivative Complaint

*Long Beach Service Interruptions*

In July 2015, SCE's customers who are served via the network portion of SCE's electric system in Long Beach, California experienced service interruptions due to multiple underground vault fires and underground cable failures. No personal injuries have been reported in connection with these events. SCE instituted an internal investigation and commissioned an external investigation of these events and their causes, which revealed that the main cause of the interruptions was a lack of adequate management oversight of the downtown network system. The investigations also revealed deficiencies in maintaining the knowledge base on the configuration and operation of the system, and a lack of sophisticated controls needed to more efficiently and effectively prevent and respond to the cascading events that occurred.

181.   Attached to the 2016 10-K were SOX certifications signed by Defendants Pizarro, Rigatti, Craver, and Scilacci attesting to the accuracy of the 2016 10-K.

### *March 18, 2016 Proxy Statement*

182.   The Company filed its 2016 Proxy Statement with the SEC on March 18, 2016. Defendants Bindra, Chang, Craver, Pizarro, Schlosberg, Stuntz, Sullivan, Tauscher, Taylor, and White solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[8]

183.   The 2016 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he [Edison International] Bylaws, Corporate Governance Guidelines, and Board committee charters, the Ethics and Compliance Code for Directors applicable to all directors of [Edison International] and SCE, and the Employee Code of Conduct applicable to all [Edison International] and SCE officers and employees are on our website at *www.edison.com/corpgov*."

184.   The 2016 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the

---

[8] Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Verified Shareholder Derivative and Double Derivative Complaint

numerous false and misleading statements alleged herein, the insider trading engaged in by nine of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

185. The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to link named executive officer ("NEO") compensation to shareholders' interests while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

186. The 2016 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was operating in violation of state laws and regulations; (2) the Company failed to align its facilities, electricity transmission, and distribution networks with required state laws and safety regulations; (3) Edison's failure to comply with state safety regulations heightened the risks for wildfires in California; (4) the Company failed to maintain internal controls; and (5) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *February 21, 2017 Form 10-K*

187. On February 21, 2017, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2016 on a Form 10-K (the "2017 10-K"), which was signed by Individual Defendants Bindra, Chang, Hernandez, Morris, Pizarro, Payne, Schlosberg, Stuntz, Sullivan, Tauscher, Taylor, and White.

188. The 2017 10-K acknowledged the CPUC's authority to regulate the Company's operations at SCE: "[t]he CPUC has the authority to regulate, among other things, retail rates, energy purchases on behalf of retail customers, SCE capital structure, rate of return, issuance of securities, disposition of utility assets and facilities, oversight of nuclear decommissioning funding and costs, and aspects of the transmission system planning, site identification and construction, including safety and environmental mitigation."

Verified Shareholder Derivative and Double Derivative Complaint

189.   The 2017 10-K again promoted the Company's commitment to progress its infrastructures and plans for SCE to lead the way by modernizing its electric grid. For example:

**Electricity Industry Trends**

The electric power industry is undergoing transformative change driven by technological advancements such as customer-owned generation and energy storage, which could alter the nature of energy generation and delivery. California's environmental policy objectives are accelerating the pace and scope of the industry change. The electric grid is a critical enabler of the adoption of new energy technologies that support California's climate change and GHG reduction objectives, which continue to be publicly supported by California policy makers notwithstanding a potential change in the federal approach to such matters. The grid is also key to enabling more customer choices with respect to new energy technologies. The transformative change taking place in the electric power industry is integral to Edison International's strategy.

SCE plans to be a key enabler of the adoption of new energy technologies that benefit customers of the electric grid while also helping the state of California achieve its environmental goals. SCE expects to achieve these objectives through modernizing the electric grid to improve the safety and reliability of the transmission and distribution network and enabling increased penetration of DERs. SCE's ongoing focus to drive operational and service excellence should allow it to achieve these objectives while controlling costs and customer rates. SCE's focus on the transmission and distribution side of the utility business aligns with California's policy supporting competitive power markets. It also represents a lower risk than investment in conventional, natural gas-fired generation, which faces potentially stricter GHG limits as well as the increasing competitiveness of renewable resource fueled generation.

190.   The 2017 10-K detailed its capital expenditure expectations to enable the Company's plans to support "a safe and reliable transmission and distribution network, and to modernize the electric grid" to be $19.3 billion between 2017 and 2020. The total capital expenditure forecasted for 2017 in particular was $4.1 billion dollars, $182 million of which was allocated for grid modernization and capital expenditures. The 2017 10-K stated that the "2017 capital expenditures is a baseline of grid modernization

Verified Shareholder Derivative and Double Derivative Complaint

spending that will promote increased safety and reliability and also allow for a timely ramp-up of grid modernization capital expenditures in subsequent years."

191.   Also detailed in the 2017 10-K was the Company's 2018 General Rate Case ("GRC"). The GRC refers to the procedures the Company must follow to allocate its operation and maintenance costs among its classes of customers. The 2017 10-K stated that "capital programs requested in SCE's 2018 GRC are focused on safety and reliability through investments in the distribution grid to replace aging equipment and enhance capabilities to integrate increasing amounts of [distributed energy resources]."

192.   The 2017 10-K explained the importance of the Company's safety procedures, further detailing the ratemaking process and CPUC oversight, stating in relevant part:

> Revenue authorized by the CPUC through triennial GRC proceedings is intended to provide SCE a reasonable opportunity to recover its costs and earn a return on its net investments in generation and distribution assets and general plant (also referred to as "rate base") on a forecast basis. The CPUC sets an annual revenue requirement for the base year which is made up of the operation and maintenance costs, depreciation, taxes and a return consistent with the authorized cost of capital (discussed below). In the GRC proceedings, the CPUC also generally approves the level of capital spending on a forecast basis. Following the base year, the revenue requirements for the remaining two years are set by a methodology established in the GRC proceeding, which generally, among other items, includes annual allowances for escalation in operation and maintenance costs and additional changes in capital-related investments. The CPUC is conducting a triennial safety model assessment proceeding ("S-MAP") to evaluate the utility models used to prioritize safety risks, examine the utilities' assessment of their key risks and their proposed mitigation programs, and develop requirements for annual reporting of risk spending and mitigation results. The risk assessment approach developed in the S-MAP will be incorporated into SCE's triennial GRC through a Risk Assessment and Mitigation Phase (RAMP), which will be initiated by November 15 in the year preceding each GRC application filing date. SCE's first RAMP will be filed in November 2018 for its 2021 GRC. The purpose of the RAMP is to provide information about the utility's assessment of its key safety risks and its proposed programs for mitigating those risks. The information developed during the RAMP will inform the

Verified Shareholder Derivative and Double Derivative Complaint

utility's recommended projects and funding requests in the subsequent phase of the GRC.

193.   Furthermore, the 2017 10-K also included similar risk disclosures to the 2016 10-K concerning the inherit risks of generating and distributing electricity and wildfires and outlined the Long Beach fires caused by service interruptions and the consequential penalties, stating:

> In July 2015, SCE's customers who are served via the network portion of SCE's electric system in Long Beach, California experienced service interruptions due to multiple underground vault fires and underground cable failures. No personal injuries were reported in connection with these events. SCE expects to incur penalties as a result of these events. Although resolution will be subject to settlement discussions with SED and CPUC review and approval, SCE has recorded a liability for the estimated loss.

194.   Attached to the 2017 10-K were SOX certifications signed by Defendants Pizarro, Rigatti, Payne, and Petmecky attesting to the accuracy of the 2017 10-K.

### *March 17, 2017 Proxy Statement*

195.   The Company filed its 2017 Proxy Statement with the SEC on March 17, 2017. Defendants Chang, Hernandez, Morris, Payne, Pizarro, Stuntz, Sullivan, Tauscher, Taylor, and White solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[9]

196.   The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he [Edison International] Bylaws, Corporate Governance Guidelines, and Board committee charters, the Ethics and Compliance Code for Directors applicable to all directors of [Edison International] and SCE, and the Employee Code of Conduct applicable to all [Edison International] and SCE officers and employees are on our website at *www.edison.com/corpgov*."

---

[9] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

57

197.   The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by nine of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

198.   The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to link NEO compensation to shareholders' interests while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

199.   The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was operating in violation of state laws and regulations; (2) the Company failed to align its facilities, electricity transmission, and distribution networks with required state laws and safety regulations; (3) Edison's failure to comply with state safety regulations heightened the risks for wildfires in California; (4) the Company failed to maintain internal controls; and (5) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### February 22, 2018 Form 10-K

200.   On February 22, 2018, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017 on a Form 10-K (the "2018 10-K"), which was signed by Individual Defendants Pizarro, Payne, Rigatti, Petmecky, Camunez, Chang, Hernandez, Morris, O'Toole, Stuntz, Sullivan, Tauscher, Taylor, and White.

201.   The 2018 10-K, repeated that the Company was subjected to CPUC regulatory authority, stating, "[t]he CPUC has the authority to regulate, among other things, retail rates, energy purchases on behalf of retail customers, SCE capital structure, rate of return, issuance of securities, disposition of utility assets and facilities, oversight of nuclear decommissioning funding and costs, and aspects of the transmission system

planning, site identification and construction, including safety and environmental mitigation." It also repeated the risk disclosures concerning the Company's operations and the risks of weather-related occurrences, outlining that:

> ***The generation, transmission and distribution of electricity are dangerous and involve inherent risks of damage to private property and injury to employees and the general public.***
>
> Electricity is dangerous for employees and the general public should they come in contact with electrical current or equipment, including through downed power lines or if equipment malfunctions. Injuries and property damage caused by such events can subject SCE to liability that, despite the existence of insurance coverage, can be significant. No assurance can be given that future losses will not exceed the limits of SCE's or its contractors' insurance coverage. The CPUC has increased its focus on public safety with an emphasis on heightened compliance with construction and operating standards and the potential for penalties being imposed on utilities. Additionally, the CPUC has delegated to its staff the authority to issue citations to electric utilities, which can impose fines of up to $50,000 per violation per day, pursuant to the CPUC's jurisdiction for violations of safety rules found in statutes, regulations, and the CPUC's General Orders. Such penalties and liabilities could be significant and materially affect SCE's liquidity and results of operations.

202.   With respect to wild-fires, the 2018 10-K disclosed various liabilities, including damage claims, wild-fires could expose the Company to, stating in relevant part:

> ***Damage claims against SCE for wildfire-related losses may materially affect SCE's financial condition and results of operations.***
>
> Prolonged drought conditions and shifting weather patterns in California resulting from climate change as well as increased tree mortality rates have increased the duration of the wildfire season and the risk of severe wildfire events. Severe wildfires and increased urban development in high fire risk areas in California have given rise to large damage claims against California utilities for fire-related losses alleged to be the result of utility practices and/or the failure of electric and other utility equipment. Certain California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the theory of inverse condemnation when a utility's facilities were determined to be a substantial cause of a

Verified Shareholder Derivative and Double Derivative Complaint

wildfire that caused the property damage. The rationale stated by these courts for applying this theory to investor-owned utilities is that property losses resulting from a public improvement, such as the distribution of electricity, can be spread across the larger community that benefited from such improvement. However, in December 2017, the CPUC issued a decision denying the investor-owned utility's request to include in its rates uninsured wildfire-related costs arising from several 2007 fires, finding that the investor-owned utility did not prudently manage and operate its facilities prior to or at the outset of the 2007 wildfires. An inability to recover uninsured wildfire-related costs could materially affect SCE's business, financial condition and results of operations. For example, if SCE is found liable for damages related to the December 2017 Wildfires, and SCE is unable to, or believes that it will be unable to, recover those damages, SCE may not have sufficient cash or equity to pay dividends to Edison International or may be prohibited from declaring such dividends because it does not meet California law requirements for the declaration of dividends.

203.   The 2018 10-K further repeated possible issues with insurance coverage, such as insufficient coverage for costs associated with wildfires.

**SCE's insurance coverage for wildfires arising from its ordinary operations may not be sufficient.**

Edison International has experienced increased costs and difficulties in obtaining insurance coverage for wildfires that could arise from SCE's ordinary operations. Edison International, SCE or its contractors may experience coverage reductions and/or increased wildfire insurance costs in future years. No assurance can be given that losses will not exceed the limits of SCE's or its contractors' insurance coverage. SCE may not be able to recover uninsured losses and increases in the cost of insurance in customer rates. Losses which are not fully insured or cannot be recovered in customer rates could materially affect Edison International's and SCE's financial condition and results of operations.

204.   Also outlined in the 2018 10-K was a discussion of the 2017 Fire which occurred in Southern California in December 2017. The 2018 10-K stated that possible future findings that the Company was at fault for the 2017 Fire substantially increased the Company's risks, noting specifically:

**Southern California Wildfires**
In December 2017, several wind-driven wildfires (the "December 2017 Wildfires") impacted portions of SCE's service territory and caused

60

substantial damage to both residential and business properties and service outages for SCE customers. The largest of these fires, known as the Thomas Fire, originated in Ventura County and burned acreage located in both Ventura and Santa Barbara Counties. According to the most recent California Department of Forestry and Fire Protection ("Cal Fire") incident information reports, the Thomas Fire burned over 280,000 acres, destroyed an estimated 1,063 structures, damaged an estimated 280 structures and resulted in two fatalities. During 2017, SCE incurred approximately $35 million of capital expenditures related to restoration of service resulting from the December 2017 Wildfires.

The causes of the December 2017 Wildfires are being investigated by Cal Fire and other fire agencies. SCE believes the investigations include the possible role of SCE's facilities. SCE expects that one or more of the fire agencies will ultimately issue reports concerning the origins and causes of the December 2017 Wildfires but cannot predict when these reports will be released or if any findings will be issued before the investigations are completed.

Any potential liability of SCE for December 2017 Wildfire-related damages will depend on a number of factors, including whether SCE is determined to have substantially caused, or contributed to, the damages and whether parties seeking recovery of damages will be required to show negligence in addition to causation. Certain California courts have previously found utilities to be strictly liable for property damage, regardless of fault, by applying the theory of inverse condemnation when a utility's facilities were determined to be a substantial cause of a wildfire that caused the property damage. The rationale stated by these courts for applying this theory to investor-owned utilities is that property losses resulting from a public improvement, such as the distribution of electricity, can be spread across the larger community that benefited from such improvement. However, in December 2017, the CPUC issued a decision denying the investor-owned utility's request to include in its rates uninsured wildfire-related costs arising from several 2007 fires, finding that the investor-owned utility did not prudently manage and operate its facilities prior to or at the outset of the 2007 wildfires.

205.   The 2018 10-K also discussed the application of inverse condemnation, a principle which holds a utility liable regardless of fault:

In addition to liability for property damages, when inverse condemnation is found to be applicable to a utility, the utility may be held liable, without regard to fault, for associated interest and attorney's fees (collectively,

Verified Shareholder Derivative and Double Derivative Complaint

"Property Losses"). If inverse condemnation is held to be inapplicable to
SCE in connection with the December 2017 Wildfires, SCE could still be
held liable for Property Losses if those losses were found to have been
proximately caused by SCE's negligence. If SCE was found negligent, SCE
also could be held liable for fire suppression costs, business interruption
losses, evacuation costs, medical expenses and personal injury/wrongful
death claims. These potential liabilities, in the aggregate, could be
substantial. Additionally, SCE could potentially be subject to fines for
alleged violations of CPUC rules and laws in connection with the December
2017 Wildfires.

206.  The 2018 10-K also acknowledged that hundreds of lawsuits had been filed
against the Company in connection to the 2017 Fire, including class actions:

SCE is aware of multiple lawsuits filed related to the December 2017
Wildfires naming SCE as a defendant. One of these lawsuits also named
Edison International as a defendant. At least four of these lawsuits were filed
as purported class actions. The lawsuits, which have been filed in the
superior courts of Ventura, Santa Barbara and Los Angeles Counties allege,
among other things, negligence, inverse condemnation, trespass, private
nuisance, and violations of the public utility and health and safety codes.
SCE expects to be the subject of additional lawsuits related to the December
2017 Wildfires. The litigation could take a number of years to be resolved
because of the complexity of the matters and the time needed to complete
the ongoing investigations.

Given the preliminary stages of the investigations and the uncertainty as to
the causes of the December 2017 Wildfires, and the extent and magnitude of
potential damages, Edison International and SCE are currently unable to
reasonably estimate whether SCE will incur material losses and, if so, the
range of possible losses that could be incurred.

207.  In addition, the 2018 10-K outlined the Company's insurance coverage and
associated limitations:

SCE has approximately $1 billion of wildfire-specific insurance coverage,
subject to a self-insured retention of $10 million per occurrence, for
wildfire-related claims for the period ending on May 31, 2018. SCE also has
approximately $300 million of additional insurance coverage for wildfire-
related occurrences for the period from December 31, 2017 to December 31,
2018, which may be used in addition to the $1 billion in wildfire insurance
for wildfire events occurring on or after December 31, 2017 and on or before

Verified Shareholder Derivative and Double Derivative Complaint

May 31, 2018, and would be available for new wildfire events, if any, occurring after May 31, 2018 and on or before December 30, 2018. Various coverage limitations within the policies that make up SCE's wildfire insurance coverage could result in material self-insured costs in the event of multiple wildfire occurrences during a policy period. SCE also has other general liability insurance coverage of approximately $450 million but it is uncertain whether these other policies would apply to liabilities alleged to be related to wildfires. Should responsibility for damages be attributed to SCE for a significant portion of the losses related to the December 2017 Wildfires, SCE's insurance may not be sufficient to cover all such damages. In addition, SCE may not be authorized to recover its uninsured damages through customer rates if, for example, the CPUC finds that the damages were incurred because SCE was not a prudent manager of its facilities. The CPUC's SED is conducting an investigation to assess the compliance of SCE's facilities with applicable rules and regulations in areas impacted by the December 2017 Wildfires.

Edison International and SCE are pursuing legislative, regulatory and legal solutions to the application of a strict liability standard to wildfire-related damages without the ability to recover resulting costs from customers. Edison International and SCE cannot predict whether or when a solution mitigating the significant risk faced by a California investor-owned utility related to wildfires will be achieved.

208.  The 2018 10-K also discussed the Mudslides and further risks associated with the Company's potential liability:

**Montecito Mudslides**

In January 2018, torrential rains in Santa Barbara County produced mudslides and flooding in Montecito and surrounding areas (the "Montecito Mudslides"). According to Santa Barbara County, the Montecito Mudslides destroyed an estimated 135 structures, damaged an estimated 324 structures, and resulted in at least 21 fatalities, with two additional fatalities presumed.

Six of the lawsuits mentioned above allege that SCE has responsibility for the Thomas Fire and that the Thomas Fire proximately caused the Montecito Mudslides, resulting in the plaintiffs' claimed damages. SCE expects that additional lawsuits related to the Montecito Mudslides will be filed.

As noted above, the cause of the Thomas Fire has not been determined. In the event that SCE is determined to have liability for damages caused by the Thomas Fire, SCE cannot predict whether the courts will conclude that the

Verified Shareholder Derivative and Double Derivative Complaint

Montecito Mudslides were caused by the Thomas Fire or that SCE is responsible or liable for damages caused by the Montecito Mudslides. As a result, Edison International and SCE are currently unable to reasonably estimate whether SCE will incur material losses and, if so, the range of possible losses that could be incurred. If it is determined that the Montecito Mudslides were caused by the Thomas Fire and that SCE is responsible or liable for damages caused by the Montecito Mudslides, then SCE's insurance coverage for such losses may be limited to its wildfire insurance. Additionally, if SCE is determined to be liable for a significant portion of costs associated with the Montecito Mudslides, SCE's insurance may not be sufficient to cover all such damages and SCE may be unable to recover any uninsured losses.

If it is ultimately determined that SCE is legally responsible for losses caused by the Montecito Mudslides, SCE could be held liable for resulting Property Losses if inverse condemnation is found applicable. If SCE is determined to have been negligent, in addition to Property Losses, SCE could be liable for business interruption losses, evacuation costs, clean-up costs, medical expenses and personal injury/wrongful death claims associated with the Montecito Mudslides. These liabilities, in the aggregate, could be substantial. SCE cannot predict whether it will be subjected to regulatory fines related to the Montecito Mudslides.

209.   Attached to the 2018 10-K were SOX certifications signed by Defendants Pizarro, Payne, Petmecky, and Rigatti attesting to the accuracy of the 2018 10-K.

***March 16, 2018 Proxy Statement***

210.   The Company filed its 2018 Proxy Statement with the SEC on March 16, 2018. Defendants Camunez, Chang, O'Toole, Morris, Payne, Pizarro, Stuntz, Sullivan, Tauscher, Taylor, and White solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[10]

---

[10] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Verified Shareholder Derivative and Double Derivative Complaint

211.   The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he [Edison International] Bylaws, Corporate Governance Guidelines, and Board committee charters, the Ethics and Compliance Code for Directors applicable to all directors of [Edison International] and SCE, and the Employee Code of Conduct applicable to all [Edison International] and SCE officers and employees are on our website at *www.edison.com/corpgov*."

212.   The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by nine of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

213.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to link NEO compensation to shareholders' interests while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

214.   The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was operating in violation of state laws and regulations; (2) the Company failed to align its facilities, electricity transmission, and distribution networks with required state laws and safety regulations; (3) Edison's failure to comply with state safety regulations heightened the risks for wildfires in California; (4) the Company failed to maintain internal controls; and (5) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

215.   The statements in ¶¶ 175-181, 187-194, and 200-209 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company violated state laws and

regulations; (2) the Company failed to align its operations, facilities, electricity transmission, and distribution networks with required state laws and safety regulations; (3) Edison's failure to comply with state safety regulations heightened the risks for wildfires in California; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Emerges as to the Facilities Misconduct**

216. On November 8, 2018, the 2018 Fires erupted across Southern California. The first fire began in Ventura County and grew over 4,000 acres while the second fire spread across more than 92,000 acres of land, much of which were National Parks Service land in the Santa Monica Mountains. The 2018 Fires ultimately affected over 45,000 Edison customers.

### *November 9, 2018 Press Release*

217. On November 9, 2018, Edison issued a press release entitled "SCE Update on Hill and Woolsey Wildfires" assuring customers that its top priority was the safety of its customers. Specifically, the press release stated:

ROSEMEAD, Calif., November 9, 2018 — Southern California Edison's Emergency Operations Center has mobilized resources and crews to assist first responders and to begin restoring power in communities affected by the wildfires in Ventura and Los Angeles counties as soon as fire officials say it is safe.

The company's top priority continues to be the safety of customers, employees and communities. SCE is working closely with first responder partners and is prepared to safely and quickly restore power as soon as possible.

As of 5:45 p.m., 23,000 customers were without power, with 20,000 of them in Los Angeles County, many affected by the fires. SCE is currently monitoring several fires impacting customers within its service territory, including the Hill Fire in Ventura County and the Woolsey Fire in Ventura and Los Angeles counties, which has moved into the Malibu area.

The fires have damaged SCE equipment and lines and caused outages in fire-affected areas. Once it is safe to do so and access has been granted,

66

SCE's damage assessment teams will determine what equipment and repairs are needed before repairs can begin. SCE air patrols may also be required to fully assess damage caused by the fires in more remote areas, but that access is limited due to flight restrictions for fire-fighting operations.

SCE has been in communication with the California Public Utilities Commission with respect to these fires and has submitted an initial electric safety incident report on the Woolsey Fire reporting an outage in the vicinity. The information in the report is preliminary. There has been no determination of origin or cause of either wildfire. SCE will fully cooperate with any investigations.

\* \* \*

**Edison's Efforts at Managing the Wildfire Threat in California**

Safety is the company's top priority and a core value for SCE. Our employees work vigilantly year-round to strengthen the electric system and protect the public and our employees against a variety of natural and man-made threats. We have long taken substantial steps to reduce the risk of wildfires in our service territory and continue to look for ways to enhance our operational practices and infrastructure. SCE employs design and construction standards, vegetation management practices and other operational practices to mitigate wildfire risk and has collaborative partnerships with fire agencies to maintain fire safety.

218.   On November 12, 2018, CPUC began investigating SCE in order to:

assess the compliance of electric facilities with applicable rules and regulations in fire impacted areas. . . .The CPUC staff investigation may include an inspection of the fire sites once Cal Fire allows access, as well as maintenance of facilities, vegetation management, and emergency preparedness and response. Cal Fire is the first responder and determines the sources of ignition of the fires and the way that the fires spread.[11]

219.   According to CPUC, SCE's electronical infrastructure could have malfunctioned where one of the fires began. Indeed, minutes before the fire reportedly

---

[11] https://www.nbclosangeles.com/news/local/State-Probes-Southern-California-Edison-for-Possible-Role-in-Deadly-Woolsey-Fire-500324141.html. Last visited January 22, 2019.

Verified Shareholder Derivative and Double Derivative Complaint

began on November 8, 2018, SCE had issued an alert to CPUC that one of their substation circuits relayed/sensed a circuit disturbance.[12]

## Repurchases During the First Relevant Period

220.   During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company spent an aggregate amount of over $298.1 million to repurchase 4.6 million shares of its own common stock at artificially inflated prices from September 1, 2014 through May 31, 2015.

221.   As the Company stock was actually only worth $59.00 per share, the price at closing on August 11, 2015, the Company overpaid approximately $26 million in total for these repurchases.

222.   According to the Company's Form 10-Q filed with the SEC on October 28, 2014, between September 1, 2014 to September 30, 2014, the Individual Defendants caused the Company to repurchase 730,271 shares of its own common stock at an average price per share of approximately $63.95, for a total cost to the Company of approximately $46.7 million.

223.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $4.95 more than the actual worth of each share between September 1, 2014 to September 30, 2014. Thus, the total over payment by the Company for repurchases of its own stock between September 1, 2014 to September 30, 2014 was over $3.6 million.

224.   According to the Company's Form 10-K filed with the SEC on February 2, 2015, between October 1, 2014 and December 31, 2014, the Individual Defendants caused the Company to repurchase 1,357,720 shares of its own common stock at an

---

[12]

https://www.edison.com/content/dam/eix/documents/Woolsey_Electric_Safety_Report.pdf/. Last visited January 22, 2019.

average price per share of approximately $63.11, for a total cost to the Company of approximately $85.6 million.

225.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $4.11 more than the actual worth of each share between October 1, 2014 and December 31, 2014. Thus, the total over payment by the Company for repurchases of its own stock between October 1, 2014 and December 31, 2014 was over $5.4 million.

226.   According to the Company's Form 10-Q filed with the SEC on April 28, 2015, between January 1, 2015 and March 31, 2015, the Individual Defendants caused the Company to repurchase 2,335,576 shares of its own common stock at an average price per share of approximately $66.04, for a total cost to the Company of approximately $154.2 million.

227.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $7.04 more than the actual worth of each share between January 1, 2015 and March 31, 2015. Thus, the total over payment by the Company for repurchases of its own stock between January 1, 2015 and March 31, 2015 was over $16.4 million.

228.   According to the Company's Form 10-Q filed with the SEC on July 30, 2015 between May 1, 2015 and May 31, 2015, the Individual Defendants caused the Company to repurchase 94,045 shares of its own common stock at an average price per share of approximately $60.25, for a total cost to the Company of approximately $5.6 million.

229.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $1.25 more than the actual worth of each share between May 1, 2015 and May 31, 2015. Thus, the total over payment by the Company for repurchases of its own stock between May 1, 2015 and May 31, 2015 was over $51,345.

Verified Shareholder Derivative and Double Derivative Complaint

230.   According to the Company's Form 10-Q filed with the SEC on July 30, 2015, between April 1, 2015 and April 30, 2015, the Individual Defendants caused the Company to repurchase 96,733 shares of its own common stock at an average price per share of approximately $62.78, for a total cost to the Company of approximately $6 million.

231.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $3.78 more than the actual worth of each share between April 1, 2015 and April 30, 2015. Thus, the total over payment by the Company for repurchases of its own stock between April 1, 2015 and April 30, 2015 was over $292,753.

232.   In total, the Company overpaid an aggregate amount of approximately $26 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

### Repurchases During the Second Relevant Period

233.   During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company spent an aggregate amount of over $811.1 million to repurchase 11 million shares of its own common stock at artificially inflated prices from March 1, 2016 through September 30, 2018.

234.   As the Company stock was actually only worth $47.19 per share, the price at closing on November 15, 2018, the Company overpaid approximately $288 million in total for these repurchases.

235.   According to the Company's Form 10-Q filed with the SEC on May 2, 2016, between March 1, 2016 to March 31, 2016, the Individual Defendants caused the Company to repurchase 656,598 shares of its own common stock at an average price per share of approximately $70.15, for a total cost to the Company of approximately $46 million.

Verified Shareholder Derivative and Double Derivative Complaint

236.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $22.96 more than the actual worth of each share between March 1, 2016 and March 31, 2016. Thus, the total over payment by the Company for repurchases of its own stock between March 1, 2016 and March 31, 2016 was over $15.1 million.

237.   According to the Company's Form 10-Q filed with the SEC on July 28, 2016, between April 1, 2016 and June 30, 2016, the Individual Defendants caused the Company to repurchase 731,780 shares of its own common stock at an average price per share of approximately $72.19, for a total cost to the Company of approximately $52.8 million.

238.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $25.00 more than the actual worth of each share between April 1, 2016 and June 30, 2016. Thus, the total over payment by the Company for repurchases of its own stock between April 1, 2016 and June 30, 2016 was over $18.2 million.

239.   According to the Company's Form 10-Q filed with the SEC on November 1, 2016, between July 1, 2016 and September 30, 2016, the Individual Defendants caused the Company to repurchase 495,477 shares of its own common stock at an average price per share of approximately $75.23, for a total cost to the Company of approximately $37.2 million.

240.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $28.04 more than the actual worth of each share between July 1, 2016 and September 30, 2016. Thus, the total over payment by the Company for repurchases of its own stock between July 1, 2016 and September 30, 2016 was over $13.8 million.

241.   According to the Company's Form 10-K filed with the SEC on February 21, 2017, between the months of October 1, 2016 and December 31, 2016, the Individual

Verified Shareholder Derivative and Double Derivative Complaint

Defendants caused the Company to repurchase 1,195,746 shares of its own common stock at an average price per share of approximately $71.26, for a total cost to the Company of approximately $85.2 million.

242.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $24.04 more than the actual worth of each share between October 1, 2016 and December 31, 2016. Thus, the total over payment by the Company for repurchases of its own stock between October 1, 2016 and December 31, 2016 was over $28.7 million.

243.   According to the Company's Form 10-Q filed with the SEC on May 1, 2017, between the months of January 1, 2017 and March 31, 2017, the Individual Defendants caused the Company to repurchase 4,298,176 shares of its own common stock at an average price per share of approximately $74.19, for a total cost to the Company of approximately $318.8 million.

244.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $27 more than the actual worth of each share between January 1, 2017 and March 31, 2017. Thus, the total over payment by the Company for repurchases of its own stock between January 1, 2017 and March 31, 2017 was over $115.9 million.

245.   According to the Company's Form 10-Q filed with the SEC on July 27, 2017, between the months of April 1, 2017 and June 30, 2017, the Individual Defendants caused the Company to repurchase 703,921 shares of its own common stock at an average price per share of approximately $79.84, for a total cost to the Company of approximately $56.2 million.

246.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $32.65 more than the actual worth of each share between April

1, 2017 and June 30, 2017. Thus, the total over payment by the Company for repurchases of its own stock between April 1, 2017 and June 30, 2017 was over $22.9 million.

247.   According to the Company's Form 10-Q filed with the SEC on October 30, 2017, between the months of July 1, 2017 and September 30, 2017, the Individual Defendants caused the Company to repurchase 686,980 shares of its own common stock at an average price per share of approximately $79.56, for a total cost to the Company of approximately $54.5 million.

248.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $32.37 more than the actual worth of each share between July 1, 2017 and September 30, 2017. Thus, the total over payment by the Company for repurchases of its own stock between July 1, 2017 and September 30, 2017 was over $22 million.

249.   According to the Company's Form 10-K filed with the SEC on February 22, 2018, between the months of October 1, 2017 and December 31, 2017, the Individual Defendants caused the Company to repurchase 1,127,043 shares of its own common stock at an average price per share of approximately $74.31, for a total cost to the Company of approximately $83.7 million.

250.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $27.12 more than the actual worth of each share between October 1, 2017 and December 31, 2017. Thus, the total over payment by the Company for repurchases of its own stock between October 1, 2017 and December 31, 2017 was over $30.5 million.

251.   According to the Company's Form 10-Q filed with the SEC on May 1, 2018, between the months of January 1, 2018 and March 31, 2018, the Individual Defendants caused the Company to repurchase 302,516 shares of its own common stock at an average price per share of approximately $62.55, for a total cost to the Company of approximately $18.9 million.

Verified Shareholder Derivative and Double Derivative Complaint

252.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $15.36 more than the actual worth of each share between January 1, 2018 and March 31, 2018. Thus, the total over payment by the Company for repurchases of its own stock between January 1, 2018 and March 31, 2018 was over $4.6 million.

253.   According to the Company's Form 10-Q filed with the SEC on July 26, 2018, between the months of April 1, 2018 and June 30, 2018, the Individual Defendants caused the Company to repurchase 389,751 shares of its own common stock at an average price per share of approximately $63.39, for a total cost to the Company of approximately $24.7 million.

254.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $16.20 more than the actual worth of each share between April 1, 2018 and June 30, 2018. Thus, the total over payment by the Company for repurchases of its own stock between April 1, 2018 and June 30, 2018 was over $6.3 million.

255.   According to the Company's Form 10-Q filed with the SEC on October 30, 2018, between the months of July 1, 2018 and September 30, 2018, the Individual Defendants caused the Company to repurchase 490,981 shares of its own common stock at an average price per share of approximately $67.42, for a total cost to the Company of approximately $33.1 million.

256.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $20.23 more than the actual worth of each share between July 1, 2018 and September 30, 2018. Thus, the total over payment by the Company for repurchases of its own stock between July 1, 2018 and September 30, 2018 was over $9.9 million.

Verified Shareholder Derivative and Double Derivative Complaint

257.   In total, the Company overpaid an aggregate amount of approximately $288 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO EDISON

258.   As a direct and proximate result of the Individual Defendants' conduct, Edison has lost and expended, and will lose and expend, many millions of dollars.

259.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions, and other lawsuits filed against the Company, its President and CEO, and its Vice President and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

260.   Such losses include, but are not limited to, approximately $314 million that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

261.   Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

262.   As a direct and proximate result of the Individual Defendants' conduct, Edison has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

263.   Plaintiff brings this action derivatively and for the benefit of Edison to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Edison, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

Verified Shareholder Derivative and Double Derivative Complaint

264.   Edison is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

265.   Plaintiff is, and has continuously been at all relevant times, a shareholder of Edison International. Plaintiff will adequately and fairly represent the interests of Edison International in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

266.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

267.   A pre-suit demand on the Board of Edison is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten Individual Defendants: Defendants Camunez, Chang, Morris, O'Toole, Pizarro, Stuntz, Sullivan, Tauscher, Taylor, and White (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was commenced.

268.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while four of them engaged in insider sales based on material non-public information, netting proceeds of over $9.4 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

269.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face

76

a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

270.  Additional reasons that demand on Defendant Pizarro is futile follow. Defendant Pizzaro has served as the Company's President and CEO since October 2016. He also serves as a member of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Pizarro with his principal occupation, and he receives handsome compensation, including $9,754,920 during the fiscal year ended December 31, 2017. Defendant Pizarro was ultimately responsible for all of the false and misleading statements and omissions that were made in the Second Relevant Period, including those contained in the Form 10-Q filed on October 28, 2014, the 2016, 2017, and 2018 10-Ks, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale before the fraud was exposed, which yielded at least $8.8 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Moreover, Defendant Pizarro is a defendant in the Second Class Action. For these reasons, too, Defendant Pizarro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

271.  Additional reasons that demand on Defendant Camunez is futile follow. Defendant Camunez has served as a Company director since 2017 and serves as a member of the Audit Committee and Nominating/Corporate Governance Committee. Defendant Camunez receives handsome compensation, including $187,077 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect

Verified Shareholder Derivative and Double Derivative Complaint

corporate assets. Furthermore, Defendant Camunez signed, and thus personally made the false and misleading statements in the 2018 10-Ks. For these reasons, too, Defendant Camunez breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

272.   Additional reasons that demand on Defendant Chang is futile follow. Defendant Chang has served as a Company director since 2007 and serves as a member of the Audit Committee and Compensation Committee. Defendant Chang receives handsome compensation, including $296,688 during the fiscal year ended December 31, 2017. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Chang signed, and thus personally made the false and misleading statements in, the 2016, 2017 and 2018 10-Ks. Her insider sales before the fraud was exposed, which yielded at least $197,575 in proceeds, demonstrate her motive in facilitating and participating in the fraud. For these reasons, too, Defendant Chang breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

273.   Additional reasons that demand on Defendant Morris is futile follow. Defendant Morris has served as a Company director since 2016 and serves on the Audit Committee and Compensation Committee.   Defendant Morris receives handsome compensation, including $254,382 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Morris signed, and thus personally made the false and misleading statements, in the 2017 and 2018 10-Ks. For these reasons, too, Defendant Morris breached his fiduciary duties, faces a substantial

Verified Shareholder Derivative and Double Derivative Complaint

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

274.   Additional reasons that demand on Defendant O'Toole is futile follow. Defendant O'Toole has served as a Company director since 2017 and serves as a member of the FOSO Committee and Compensation Committee. Defendant O'Toole receives handsome compensation, including $126,198 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant O'Toole signed, and thus personally made the false and misleading statements in, the 2018 10-Ks. For these reasons, too, Defendant O'Toole breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

275.   Additional reasons that demand on Defendant Stuntz is futile follow. Defendant Stuntz has served as a Company director since 2014 and serves as Chair of the Nominating/Corporate Governance Committee and as a member of the FOSO Committee. Defendant Stuntz receives handsome compensation, including $273,744 during the fiscal year ended December 31, 2017. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Stuntz signed, and thus personally made the false and misleading statements in, the 2016, 2017 and 2018 10-Ks. Defendant Stuntz is also an equity partner at Stuntz, Davis, & Staffer, P.C. law firm, which paid $209,848 to the Company to sublease office space in 2017, and has subleased office space from the Company since before Stuntz joined as a director. For these reasons, too, Defendant Stuntz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

Verified Shareholder Derivative and Double Derivative Complaint

276.   Additional reasons that demand on Defendant Sullivan is futile follow. Defendant Sullivan has served as a Company director since 2015 and serves as Chair of the Board and a member of the Nominating/Corporate Governance Committee and the FOSO Committee. Defendant Sullivan receives handsome compensation, including $377,250 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sullivan signed, and thus personally made the false and misleading statements in, the 2016, 2017 and 2018 10-Ks. For these reasons, too, Defendant Sullivan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

277.   Additional reasons that demand on Defendant Tauscher is futile follow. Defendant Tauscher has served as a Company director since 2013 and as Chair of the FOSO Committee and a member of the Nominating/Corporate Governance Committee. Defendant Tauscher receives handsome compensation, including $274,636 during the fiscal year ended December 31, 2017. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Tauscher signed, and thus personally made the false and misleading statements in, the 2016, 2017 and 2018 10-Ks. Her insider sales before the fraud was exposed, which yielded at least $216,472 in proceeds, demonstrate her motive in facilitating and participating in the fraud. For these reasons, too, Defendant Tauscher breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

278.   Additional reasons that demand on Defendant Taylor is futile follow. Defendant Taylor has served as a Company director since 2011 and serves as Chair of the

Audit Committee and a member of the Compensation Committee. Defendant Taylor receives handsome compensation, including $275,318 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Taylor signed, and thus personally made the false and misleading statements in, the 2016, 2017 and 2018 10-Ks. For these reasons, too, Defendant Taylor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

279.   Additional reasons that demand on Defendant White is futile follow. Defendant White has served as a Company director since 2007 and serves as Chair of the Compensation Committee and a member of the Nominating/Corporate Committee. Defendant White receives handsome compensation, including $302,179 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant White signed, and thus personally made the false and misleading statements in, the 2016, 2017 and 2018 10-Ks. His insider sale before the fraud was exposed, which yielded at least $204,175 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant White breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

280.   Additional reasons that demand on the Board is futile follow.

281.   As described above, four of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Chang, Pizarro, Tauscher, and White collectively received proceeds of over $9.4 million as a result of insider

81

transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

282.   Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

283.   In violation of the Codes, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Codes, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

284.   Edison has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Edison any part of the damages Edison suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

285.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and

82

cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

286.   The acts complained of herein constitute violations of fiduciary duties owed by Edison officers and directors, and these acts are incapable of ratification.

287.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Edison. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Edison, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

288.   If there is no directors' and officers' liability insurance, then the Directors will not cause Edison to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

289.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

Verified Shareholder Derivative and Double Derivative Complaint

# FIRST CLAIM

## Against Individual Defendants for Violations of

## Section 14(a) of the Exchange Act

290.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

291.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

292.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

293.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

294.   Under the direction and watch of the Directors, the 2016, 2017, and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company was operating in violation of state laws and regulations; (2) the Company failed to align its facilities, electricity transmission, and distribution networks with required state laws and safety regulations; (3) Edison's failure to comply with state safety

84

regulations heightened the risks for wildfires in California; and (4) the Company failed to maintain internal controls.

295.   The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to link NEO compensation to shareholders' interests while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

296.   The Proxy Statements also made references to the Codes. The Codes required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Codes. The Proxy Statements failed to disclose these violations and also failed to disclose that the Codes' terms were being violated.

297.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

298.   The false and misleading elements of the Proxy Statements led to the re-election of Defendants Camunez, Chang, Morris, O'Toole, Pizarro, Stuntz, Sullivan, Tauscher, Taylor, and White, which allowed them to continue breaching their fiduciary duties to Edison.

299.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

85

300.   Plaintiff on behalf of Edison has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Exchange Act

301.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

302.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Edison. Not only is Edison now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Edison by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over a billion dollars of its own shares on the open market at artificially-inflated prices, damaging Edison.

303.   During the First Relevant Period and Second Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

304.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Edison not misleading.

305.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual

86

Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Edison. The Individual Defendants acted with scienter during the First Relevant Period and Second Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

306.   In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and signed the Company's Form 10-Ks filed with the SEC during the First Relevant Period and Second Relevant Period.

307.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

308.   Plaintiff on behalf of Edison has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of
### Section 20(a) of the Exchange Act

309.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

310.   The Individual Defendants, by virtue of their positions with Edison and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Edison and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Edison to engage in the illegal conduct and practices complained of herein.

311.   Plaintiff on behalf of Edison has no adequate remedy at law.

87

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

312.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

313.  Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Edison's business and affairs.

314.  Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

315.  The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Edison.

316.  In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

317.  In further breach of their fiduciary duties owed to Edison, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: : (1) the Company was operating in violation of state laws and regulations; (2) the Company failed to align its facilities, electricity transmission, and distribution networks with required state laws and safety regulations; (3) Edison's failure to comply with state safety regulations heightened the risks for wildfires in California; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

318.  The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company engaged in and/or allowed the Ex Parte Misconduct; (2) the Company was not abiding by applicable rules with respect to

88

the settlement discussions surrounding the shutdown of San Onofre; (3) the Company was making false representations regarding the resolution of the San Onofre dispute; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

319.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

320.   In breach of their fiduciary duties, nine of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing over $1.1 billion worth of Company stock at artificially inflated prices.

321.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

322.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme

and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

323.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

324.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Edison has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

325.   Plaintiff on behalf of Edison has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

326.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

327.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Edison.

328.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Edison that was tied to the performance or artificially inflated valuation of Edison, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

329.   Plaintiff, as a shareholder and a representative of Edison, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all

Verified Shareholder Derivative and Double Derivative Complaint

profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

330.   Plaintiff on behalf of Edison has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

331.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

332.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

333.   In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

334.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

335.   Plaintiff on behalf of Edison has no adequate remedy at law.

## PRAYER FOR RELIEF

336.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Edison, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Edison;

(c)   Determining and awarding to Edison the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

Verified Shareholder Derivative and Double Derivative Complaint

(d)     Directing Edison and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Edison and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Edison to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Edison restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 28, 2019                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           By: /s/Laurence M. Rosen
                                           Laurence M. Rosen, Esq. (SBN 219683)
                                           355 S. Grand Avenue, Suite 2450
                                           Los Angeles, CA 90071
                                           Telephone: (213) 785-2610

Verified Shareholder Derivative and Double Derivative Complaint

Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Verified Shareholder Derivative and Double Derivative Complaint

DocuSign Envelope ID: F703175C-87D6-4E96-97CF-D0749A1192E2

<u>VERIFICATION</u>

I, Stan Kieffer  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _ th day of January 2019.
                                                                1/25/2019

DocuSigned by:

*Stan Kieffer*

F326910B00B94A5...

Stan Kieffer